******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

IN RE KYARA H. ET AL.*
(AC 35506)

Beach, Keller and Pellegrino, Js.

*Argued October 21, 2013—officially released January 16, 2014***

(Appeal from Superior Court, judicial district of Windham, Juvenile Matters at Willimantic, Hon. Francis J. Foley III, judge trial referee.)

*David J. Reich*, assigned counsel, for the appellant (respondent father).

*Benjamin Zivyon*, assistant attorney general, with whom were *Susan T. Pearlman*, assistant attorney general, and, on the brief, *George Jepsen*, attorney general, and *Michael J. Besso*, assistant attorney general, for

the appellee (petitioner).

*Raymond F. Parlato*, for the minor children.

*Opinion*

KELLER, J. The respondent father, Tyrone H., appeals from the judgments of the trial court, *Hon. Francis J. Foley III*, judge trial referee, terminating his parental rights with respect to his minor son, Jahein H., and minor daughter, Kyara H., pursuant to General Statutes § 17a-112 (j) (3) (B) (i), for failure to achieve such a degree of personal rehabilitation as would encourage the belief that, within a reasonable time, he could assume a responsible position in the lives of his children.[1] On appeal, the respondent claims that the trial court's statutorily required finding that the Department of Children and Families (department) made reasonable efforts to reunify him with his two children was clearly erroneous because the department failed to continue to make such efforts until the date the court terminated parental rights. We affirm the judgments of the trial court.

The following facts, as found by the trial court by clear and convincing evidence, and procedural history are relevant to the disposition of this appeal. Andrea K., the mother of Kyara and Jahein, met the respondent when she was nineteen years old and soon became pregnant. Kyara was born on January 22, 2004. Tests for the presence of substances in her system were positive for the presence of marijuana, which Andrea admitted she used throughout her pregnancy. Andrea transferred guardianship of Kyara to the child's maternal grandfather, Leander K., in whose custody Kyara remained for the first three years of her life.

Andrea gave birth to Jahein, her second child by the respondent, in that same year, on November 13, 2004. Tests revealed that Jahein also was exposed to marijuana during pregnancy. Two months after Jahein's birth, the respondent was arrested for an assault upon Andrea. Andrea stated that the respondent left her shortly after this incident and thereafter, did not acknowledge his children in any way. The respondent was later convicted of the assault and sentenced to one year in jail, execution suspended, with three years of probation. He later violated his probation and was incarcerated.

From May 6, 2005, until the spring of 2006, neither Kyara nor Jahein lived with Andrea. Kyara was residing with Leander and Jahein was in foster care, having been removed from Andrea's care by the department after Andrea, while extremely intoxicated and holding Jahein, lost her balance and fell, causing Jahein to hit his head. Andrea was arrested but participated in services and treatment programs, enabling Jahein to be returned to her care by the end of 2005.

In the summer of 2008, Andrea met another man, Jose M., and began a four year relationship marred by substance abuse and incidents of domestic violence.

This relationship produced three more children.

On March 26, 2009, when Andrea was pregnant with the first of her three children by Jose, the petitioner, the Commissioner of Children and Families (commissioner), sought and obtained temporary custody of Kyara and Jahein due to their exposure to illegal substances, domestic violence and inadequate supervision in Andrea's home. Andrea and Jose participated in services resulting in the return of Kyara and Jahein in October, 2009, under an order of protective supervision.[2]

In November, 2009, during the period of court-ordered protective supervision for Kyara and Jahein, Andrea was arrested for disorderly conduct and fined $200. This was her third arrest. The following month, Andrea's third child, Trevon, was born, with indications of exposure to marijuana in utero. On April 11, 2001, Andrea's fourth child, Kahlil, was born, also testing positive for exposure to marijuana during the pregnancy.[3] Andrea acknowledged to the department that she used marijuana and alcohol throughout this pregnancy and admitted mutual domestic violence involving her and Jose. Andrea stated that she used marijuana daily and would drink two or three times per week, including two or three forty ounce bottles of beer and "a few shots." From 2008 to 2012, while he was in a relationship with Andrea and was involved in raising her children, Jose bought, used and possessed illegal drugs. Jose reported that both he and Andrea smoked marijuana three to four times a day, even during Andrea's pregnancies.

Andrea reported that she and Jose also smoked K-2, an illegal, synthetic drug chemically similar to marijuana. This drug can be very potent and is popular with marijuana users because it does not show up on drug screenings unless used within the preceding two hours of testing. It can produce hallucinations, severe agitation, panic attacks, dangerously elevated heart rate and blood pressure and seizures.

The trial court relied on the October 14, 2011 affidavit in support of the commissioner's motion for temporary custody, in which the department social worker Michelle Dwyer "describes an horrific and chaotic home life for Andrea, Jose, the children and Andrea's alcoholic father, Leander." In August, 2010, Jose assaulted Andrea in front of Kyara, Jahein and Trevon. Kyara reported to the police what had happened, stating, "Jose . . . punched mommy and dragged her on the floor . . . ."

On April 18, 2011, the commissioner filed neglect petitions on behalf of Kyara, Jahein and their two younger siblings, but did not seek their removal. In September, 2011, a behaviorist and clinician at Community Resources, Inc., who was providing services to

Andrea, told a department social worker that Andrea said that Kyara roams the house in the middle of the night, urinating in her room and that Andrea feared leaving Kyara and Jahein unsupervised with one another because Kyara was engaging in inappropriate behaviors with Jahein. During an arrest for motor vehicle charges on September 30, 2011, Andrea became so agitated and combative with police she had to be secured in a jail cell. On October 12, 2011, a department social worker observed Trevon, then twenty-two months old, with two black eyes. Andrea and Leander indicated Trevon fell on a piece of furniture. The next day, Jose went to Andrea's home with a friend. Andrea had been drinking and continued to drink throughout the afternoon and evening. Jose and Andrea then went to a motel with Trevon and six month old Kahlil. Jose reported that Andrea was so drunk she dropped Kahlil twice, then left the hotel to start walking on Route 6, wearing no shoes and having unzipped pants. Jose called police and Andrea was arrested. The court noted that two days later, on October 14, 2011, the commissioner "finally" sought and obtained an order of temporary custody of all four children. For Kyara and Jahein, this was their third removal from Andrea's care.[4]

After specifically addressing Andrea and the children's involvement with the department since 2004, the court, as to the respondent, found that little is known about him because he refused to provide background information to the department and refused to participate in services to which the department might have referred him. The trial court, referring to the respondent as the "male biological parent," determined: "He left Andrea shortly after he assaulted her in January, 2005. He has *never* served as a father, as that term is normally understood." (Emphasis added.) The court further found: "What is known about this man is that between 2004 and 2010, he has been arrested nine times and spent a considerable amount of his adult life in prison. Even in prison he is not a good citizen. His Department of [Correction] record reflects loss of telephone privileges for thirty days, loss of recreation for fifteen days, and punitive segregation for seven days. . . . His arrest and conviction record . . . indicates that [the respondent] is a convicted felon. He has multiple arrests for assault, breach of peace, disorderly conduct, criminal impersonation, violation of protective orders, violation of probation, interfering or resisting arrest and possession of narcotics. On October 17, 2011, he received a five year sentence, suspended after eighteen months with [five] years of probation. He was also convicted of a subsequent assault and breach of peace upon his girlfriend, for which he received concurrent time of one year on each [offense]. This charge was a domestic violence related assault on the mother of his newest child. . . . [O]n July 16, 2012, he filed a motion in this court to have guardianship of Kyara and Jahein trans-

ferred to his new girlfriend, Kimberly B., the same woman he recently assaulted. Midway through the termination trial, [the respondent] withdrew his motion for transfer of guardianship to Kimberly and thereafter, Kimberly stopped attending the trial. His lawyer reported that [the respondent] now wanted the children 'to go to Andrea,' their mother, instead of his girlfriend."

The respondent was released from prison in August, 2012, just a few weeks after the petitions to terminate his parental rights were filed on July 25, 2012. The court noted the respondent's shifting positions before and at trial relative to the placement of children, neither of which included any plan that he personally would care and provide for them. Nonetheless, "[t]o give full weight to all the evidence," the court acknowledged the respondent's attendance at a New Perceptions sixteen class "Treating Alcohol Dependence Program," in November, 2012. The court, to emphasize its conclusion that the respondent's lack of concern for his children was longstanding and continuing, indicated, "[t]here is nothing in the letter from New Perceptions [submitted as respondent's Exhibit 1A that] addresses whether [the respondent] ever expressed love and affection for his children; ever expressed personal concern over their health, education and general well-being; ever fulfilled his duty to supply the necessary food, clothing and medical care for his children; ever provided them with an adequate domicile; or ever provided his children with social and religious guidance. The court concludes since he did not visit them after his release and never has provided for them before, that he did not."[5] The court determined that the respondent is "not actively involved with Kyara and Jahein; he does not support them and he does not visit them except when he is incarcerated."

In the termination of parental rights petitions regarding the respondent's two children, the commissioner alleged that the respondent had failed to rehabilitate sufficiently and that termination of the parental rights was in the children's best interests. The commissioner also alleged, regarding the reasonable efforts requirement of § 17a-112 (j) (1),[6] both that the department had made reasonable efforts to locate and reunify the respondent with his children and that he was unable or unwilling to benefit from such efforts.

The court stated that "in the adjudicatory phase of the proceedings, the judicial authority is limited to evidence of events preceding the filing of the petition or the latest amendment, except, as here, where the judicial authority must consider subsequent events as part of its determination as to the existence of a ground for termination of parental rights, i.e. rehabilitation." The court found by clear and convincing evidence, without specifying any temporal period, that the department had made reasonable efforts to locate the respondent

("the parents have all been served and appeared and thus located") and that "[the department] has made reasonable efforts through the offer of appropriate and available services to promote a reunification with the children." Later, the court specifically found as to the respondent that "the children, Kyara and Jahein, have been found in a prior proceeding to have been neglected or uncared for and the father has failed to achieve such degree of personal rehabilitation that would encourage the belief that within a reasonable time, considering the age and needs of the children, that [the respondent] could assume a responsible position [in] the life of the children."

In the dispositional phase of the proceeding,[7] the court set forth its findings with regard to the seven factors set forth in § 17a-112 (k), first restating most of its adjudicatory findings regarding the respondent. It then stated that "given the factual findings made in its decision, compliance with § 17a-112 (k) as it relates to the male biological parent [the respondent], only serves to re-state the obvious: [The respondent] has never acted as a parent and has refused any services which might assist him in acquiring parental skills."

The court found by clear and convincing evidence that termination of the respondent's parental rights in Kyara and Jahein was in their best interests after considering various factors, "including the children's need for safety, stability and nurturance; their interest in sustained growth, development, well-being, and in the continuity and stability of their environment . . . their age and individual needs; the length and nature of their stay in foster care, the contact maintained with their parents and the potential benefit or detriment to the children of terminating the parental rights, the genetic bond to the biological parents . . . and the seven statutory factors and the court's findings thereon." (Citations omitted; internal quotation marks omitted.) Additional facts and procedural history will be set forth as necessary.

We begin by setting forth the statutory requirements for granting a petition for the termination of parental rights. "A hearing on a petition to terminate parental rights consists of two phases, adjudication and disposition. . . . If the trial court determines that a statutory ground for termination exists, it proceeds to the dispositional phase. In the dispositional phase, the trial court determines whether termination is in the best interest of the child." (Citation omitted; internal quotations marks omitted.) *In re Roshawn R.*, 51 Conn. App. 44, 52, 720 A.2d 1112 (1998). In the adjudicatory phase of the proceeding, the court must make separate determinations as to reasonable efforts and the statutory grounds for termination. "In the adjudicatory phase, the judicial authority is limited to evidence of events preceding the filing of the petition or the latest amendment, except

where the judicial authority must consider subsequent events as part of its determination as to the existence of a ground for termination of parental rights. . . . In the adjudicatory phase, the court *may* rely on events occurring after the date of the filing of the petition to terminate parental rights when considering the issue of whether the degree of rehabilitation is sufficient to foresee that the parent may resume a useful role in the child's life within a reasonable time." (Citation omitted; emphasis in original; internal quotation marks omitted.) *In re Anthony H.*, 104 Conn. App. 744, 757–58, 936 A.2d 638 (2007), cert. denied, 285 Conn. 920, 943 A.2d 1100 (2008).

As the statutory ground for terminating the respondent's rights, the petition alleges failure to achieve personal rehabilitation under § 17a-112 (j) (3) (B) (i). With respect to the ground of failure to achieve personal rehabilitation, set forth in § 17a-112 (j) (3) (B) (i), the court is required to find that the child (1) "has been found by the Superior Court . . . to have been neglected or uncared for in a prior proceeding," (2) "the parent of such child has been provided specific steps to take to facilitate the return of the child to the parent pursuant to section 46b-129," and (3) the parent "has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child."

A termination of parental rights under § 17a-112 (j) on a nonconsensual ground, as has been pleaded as to the respondent here, requires the court, in the adjudicatory phase, to find whether there is clear and convincing evidence that (1) the department has made reasonable efforts to locate the parent; and (2) the department has made reasonable efforts to reunify the child with each parent unless the court finds that the parent is unable or unwilling to benefit from reunification efforts.

The factual determination for the court is whether the parent has achieved rehabilitation as contemplated under the statute, that is, rehabilitation sufficient to render the parent able to responsibly care for the child. "Personal rehabilitation as used in [§ 17a-112 (j) (3) (B)] refers to the restoration of a parent to his or her former constructive and useful role as a parent. . . . [The statute] requires the trial court to analyze the [parent's] rehabilitative status as it relates to the needs of the particular child, and further, that such rehabilitation must be foreseeable within a reasonable time. . . . [The statute] requires the court to find, by clear and convincing evidence, that the level of rehabilitation . . . achieved, if any, falls short of that which would reasonably encourage a belief that at some future date [the parent] can assume a responsible position in [the] child's life." (Citations omitted; internal quotation

marks omitted.) *In re Eden F.*, 250 Conn. 674, 706, 741 A.2d 873 (1999).

An inquiry regarding personal rehabilitation requires "a historical perspective of the respondent's child caring and parenting." (Internal quotation marks omitted.) *In re Galen F.*, 54 Conn. App. 590, 594, 737 A.2d 499 (1999); see *In re Christopher B.*, 117 Conn. App. 773, 786–88, 980 A.2d 961 (2009) (trial court properly relied on respondent's history with department prior to filing of most recent neglect petition); see also *In re Jennifer W.*, 75 Conn. App. 485, 499, 816 A.2d 697 (court must make inquiry into full history of respondent's parenting abilities), cert. denied, 263 Conn. 917, 821 A.2d 770 (2003).

As to the respondent, the court found by clear and convincing evidence that his children had been found neglected in a prior proceeding, that the department had made reasonable efforts to locate the respondent, that the respondent had been provided with specific steps on October 14, 2011, and later, on February 1, 2012, and that the respondent had failed to achieve such degree of personal rehabilitation that would encourage the belief that within a reasonable time, considering the age and needs of the children, he could assume a responsible position in their lives.

The respondent does not dispute any of these findings, nor does he dispute the court's findings that it was in the best interests of Kyara and Jahein that his parental rights be terminated. His sole claim on appeal focuses on the court's finding, by clear and convincing evidence, that the department had made reasonable efforts to reunify Kyara and Jahein with him. The court found: "[The respondent] was uncooperative and did not attempt to comply with any rehabilitative services save the [Treating] Alcohol Dependence program, which was likely required as a condition of his release and probation. He has demonstrated no interest in the children and has made no sustained effort at rehabilitation. He has rebuffed all [department] overtures to assist him. He is entirely, unreformed."

The respondent argues that although the department presented evidence that he told the department on three occasions prior to the filing of the termination petitions on July 25, 2012, that he was not interested in any department services, the department was required by the specific steps to continue to make efforts to refer the respondent to appropriate services until the trial concluded, and there was no evidence that the department even contacted him after his release in August, 2012, to inquire if he had changed his position of noncooperation with the department or its services. The commissioner responds that the evidence reasonably supports the court's findings that the department had made reasonable efforts to reunify respondent with his children, regardless of whether the trial court consid-

ered evidence through the date the petitions were filed, July 25, 2012, the adjudicatory date, or through the conclusion of trial on February 21, 2013, because the law does not require a continuation of reasonable efforts on the part of the department when they will be futile.

In support of his claim, the respondent asserts that in accordance with § 17a-112 (j) (1), the court was required to find that the department had made reasonable efforts to reunify him with his children until the time that the trial concluded on February 21, 2013. Next, the respondent asserts that the evidence did not support the court's finding that the department made reasonable efforts to reunify because there is no evidence that the department made any efforts, reasonable or otherwise, after the respondent's release from prison in August, 2012. We will address each aspect of the claim, in turn.

I

The respondent first argues that § 17a-112 (j) (1) requires the department to continue to make reasonable efforts to reunify a parent with his or her child until the conclusion of the trial on the termination of parental rights petition unless the court has found at a previous proceeding that, under subsection (a) of General Statutes § 17a-111b,[8] such efforts are no longer appropriate. In light of the circumstances of the present case, we need not decide whether the respondent's interpretation of § 17a-112 (j) (1), which the respondent asserts is at odds with our case law interpreting the statute, is correct.

"As this court has noted, [t]here is a distinction between a finding on reasonable reunification efforts under § 17a-112 (j) and consideration of the same under § 17a-112 (k). Section 17a-112 (j) (1) requires the court to make a finding by clear and convincing evidence in the adjudicatory phase concerning the reasonable efforts made by the department of children and families . . . to reunify the child with the parent as a prerequisite to terminating parental rights. . . . A court need not make that finding, however, if the evidence establishes that the parent is unable or unwilling to benefit from reunification efforts or if the court determines at a hearing pursuant to General Statutes § 17a-110 (b) or General Statutes § 17a-111b that such efforts are inappropriate. . . .[9]

"By contrast, [§] 17a-112 (k) requires the court in the dispositional phase to make written findings regarding seven statutory factors, including [t]he timeliness, nature and extent of services offered, provided and made available to the parent and the child by an agency to facilitate the reunion of the child with the parent and whether the department has made reasonable efforts to reunite the family . . . .

"As noted, in determining whether the department

has made reasonable efforts to reunify a parent and a child or whether there is sufficient evidence that a parent is unable or unwilling to benefit from reunification efforts, the court is required in the adjudicatory phase to make its assessment on the basis of events preceding the date on which the termination petition was filed. See also Practice Book § 35a-7 (a)."[10] (Citations omitted; footnote altered; internal quotation marks omitted.) *In re Shaiesha O.*, 93 Conn. App. 42, 47–49, 887 A.2d 415 (2006). This court has consistently held that the court, "[w]hen making its reasonable efforts determination during the adjudicatory phase . . . is limited to considering only those facts preceding the filing of the termination petition or the most recent amendment to the petition . . . ." *In re Paul O.*, 141 Conn. App. 477, 483, 62 A.3d 637, cert. denied, 308 Conn. 933, 64 A.3d 332 (2013).

The commissioner, however, concedes that, in the absence of a court order that otherwise relieves the department of its reasonable efforts obligation, § 17a-112 (j) (1), *as amended by Public Act 06-102*, requires the department to prove that it has continued to make reasonable efforts up to the time of the trial's conclusion. We, however, need not accept the respondent's invitation to reexamine prior precedent on this issue. Under the circumstances of this case, although the trial court's decision does not, explicitly, indicate the specific time period for which it considered evidence as to the reasonable steps element, the evidence reasonably supports the court's findings that the department had made reasonable efforts to reunify respondent with his children, regardless of whether the trial court considered evidence through the date the petitions were filed, July 25, 2010, or through the conclusion of trial on February 21, 2013.[11] This is because, as we discuss in part II of this opinion, the law does not require a continuation of reasonable efforts on the part of the department when such efforts will be futile.

II

We now address the respondent's second argument, whether the evidence was sufficient for the court to find the department made reasonable efforts to reunify the respondent with his children.

Our Supreme Court in *In re Melody L.*, 290 Conn. 131, 962 A.2d 81 (2009), set forth the standard for reviewing the trial court's finding that the department made reasonable efforts to reunify a parent and a child in a termination of parental rights case. "The trial court's determination of this issue will not be overturned on appeal unless, in light of all of the evidence in the record, it is clearly erroneous. . . . A finding is clearly erroneous when either there is no evidence in the record to support it, or the reviewing court is left with the definite and firm conviction that a mistake has been made. . . . On appeal, our function is to deter-

mine whether the trial court's conclusion was factually supported and legally correct. . . . In doing so . . . [g]reat weight is given to the judgment of the trial court because of [the court's] opportunity to observe the parties and the evidence. . . . We do not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached. . . . [Rather] every reasonable presumption is made in favor of the trial court's ruling." (Citations omitted; internal quotation marks omitted.) Id., 145.

The "reasonableness" of the department's efforts must be assessed in the context of each case. "The word reasonable is the linchpin on which the department's efforts in a particular set of circumstances are to be adjudged, using the clear and convincing standard of proof. Neither the word reasonable nor the word efforts is, however, defined by our legislature or by the federal act from which the requirement was drawn. . . . [R]easonable efforts means doing everything reasonable, not everything possible. . . . [R]easonableness is an objective standard . . . and whether reasonable efforts have been proven depends on the careful consideration of the circumstances of each individual case." (Citation omitted; internal quotation marks omitted.) *In re Ebony H.*, 68 Conn. App. 342, 349, 789 A.2d 1158 (2002).

This court has applied the general meaning of "reasonable" and stated that "[i]t is axiomatic that the law does not require a useless and futile act." *In re Antony B.*, 54 Conn. App. 463, 476, 735 A.2d 893 (1999). In *In re Antony B.*, the trial court's findings that the department made reasonable efforts at reunification were upheld in light of the fact that the respondent rejected many of the services offered to her and did not choose to accept services from the department. See id. Several other cases involving appeals from termination of parental rights judgments have held that the department is not required to continue to provide reasonable efforts to a parent when the parent refuses to participate or engage in any of those efforts. See *In re Christopher C.*, 134 Conn. App. 473, 481–82, 39 A.3d 1127 (2012) (despite department's repeated offers of referrals and assistance so respondent could satisfy specific steps requirements respondent refused to comply); see also *In re Samantha C.*, 268 Conn. 614, 632–33, 847 A.2d 883 (2004) (not unreasonable for department to abandon reunification efforts when it did, given age and needs of the child, time allotted for the respondents' rehabilitation and time child had spent in foster care); *In re Daniel C.*, 63 Conn. App. 339, 362, 776 A.2d 487 (2001) (after respondents had not benefited from decade of efforts and services, it was not unreasonable for department to decline to pursue reunification as goal after children's final removal).

The evidence in the record demonstrates that there is sufficient evidence on which to affirm the court's

finding that the department made reasonable efforts. In making its reasonable efforts finding as to the respondent, the court's decision may reasonably be interpreted as including the interest, or lack thereof, the respondent had in cooperating with reunification efforts before and after the time of the adjudicatory date, July 25, 2011, up until the date the trial concluded, February 21, 2012.

Initially, we observe that, to the extent that the assessment of reasonable efforts is made through the date of the filing of the termination petitions, the respondent concedes that the department's wholly unsuccessful efforts were reasonable. The record reflects that during the pendency of the earlier neglect petitions affecting Kyara and Jahein, filed in 2005 and 2009, the respondent was offered reunification services. On April, 11, 2011, neglect petitions were filed on behalf of Kyara and Jahein and their two younger siblings. At three separate times prior to the filing of the termination of parental rights petitions, the respondent expressly stated to the department worker his unwillingness to engage in any services. On April 25, 2011, prior to his incarceration, one week after neglect petitions for his children had been filed for the third time, and after he had been presented with preliminary specific steps outlining a plan for reunification efforts, the respondent told a department worker he "did not want to be involved with the department."

It is clear from the record that during the period of time just prior to the children's removal in October, 2011, the respondent had an opportunity to observe their chaotic living environment. Andrea reported that the respondent spent time in the backyard of the home drinking with Leander, but he ignored his children, Kyara and Jahein. On September 14, 2011, a Community Residences, Inc., behaviorist, L. J. Grenada, who provided a home-based intensive family preservation service, observed seven year old Kyara display highly seductive body language in an effort to gain the respondent's attention while he socialized across the street from the family home. Soon after the court's October 14, 2011 orders granting temporary custody, placing his children in department foster care, the respondent was arrested and incarcerated for assaulting his girlfriend, Kimberly B. At the time of the children's last removal in October, 2011, Andrea reported to the department that the respondent "does not acknowledge his children in any way." On October 17, 2011, just after his two children were ordered into the commissioner's custody for the second time, he received a five year sentence, suspended after eighteen months with five years of probation after being convicted of a 2010 assault and breach of peace involving domestic violence with the mother of his youngest child, Kimberly B.

On February 1, 2012, the date the children were adjudicated neglected, the respondent was provided with

specific steps, which he signed. The steps indicated to the respondent that services would be determined once he was released from incarceration. At the bottom of the specific steps form, the respondent acknowledged that if he did not follow the steps, the chance that his parental rights would be terminated would increase. He also acknowledged that he understood that he should contact his lawyer and/or the department worker if he needed help in reaching any of his steps. The department could not be faulted for failing to provide any services for the respondent prior to his release from prison. His incarceration began before the children were taken from Andrea's custody and endured until August, 2012. The record also reflects that he did not or was unable to engage in any programs offered to inmates in the correctional facility. He was provided with two opportunities to participate in a scheduled administrative case review concerning his children via teleconference on November 29, 2011, and May 18, 2012, but did not call in.

At least twice, a department worker talked to the respondent about his children's cases, in November, 2011, and April, 2012, and suggested services in which he could participate when released. In both these conversations, the respondent stated that "he would not be willing to do anything once he was released." He also stated that the department is "full of it," that he did not want to attend any treatment programs once he is released from prison, and that he was not going to "jump through any hoops." During this incarceration, at his request, the department provided the respondent with visits with the children by bringing the children on a monthly basis to the correctional facility where the respondent was housed. During these visits, the record reflects he did not engage with his children. He would wait for them to acknowledge him and he was demeaning to them. The respondent did not exercise his right to visit his children after his release.

On July 16, 2012, while objecting to the department's permanency plans of termination of parental rights for both his children, the respondent filed a motion to transfer guardianship of them to Kimberly B., the girlfriend he had assaulted in 2011. There is no indication anywhere in the record that the respondent advised the court at that time, or upon his imminent release, that he was willing to accept referrals for services.

At the beginning of the trial, the record reflects that the respondent reminded the court that consideration of his motion to transfer guardianship to Kimberly B. was to be part of the consolidated proceedings. The only evidence of a program he had attended to address issues of substance abuse and parenting identified in his specific steps was a sixteen week alcohol dependence program at New Perceptions. This program was not a referral he accepted from the department, allowing for

the further reasonable inference that he still did not wish to request its assistance and preferred to choose his own route, or that he only participated in this program because of the conditions of his probation. Although he argued that his attendance at this program, not selected by the department, was evidence of his rehabilitation, the court found his involvement in the program, in and of itself, was insufficient proof as to that fact. In addition, the department worker testified that the respondent had made no indication to the department after his release from prison that he was willing to engage in services that would assist in his rehabilitation.

Even after withdrawing his motion to transfer guardianship to Kimberly B. near the end of the trial, the respondent, despite his claimed rehabilitation and the evidence presented during the trial that Andrea had not fully addressed her parenting issues, advocated that the children should be returned to Andrea's care. At no time during the trial did the respondent indicate he was ready to begin reunification efforts and comply with his specific steps as part of his effort to avoid termination.[12]

In the beginning of its memorandum of decision, the court found that the department has made reasonable efforts through the offer of appropriate and available services to promote a reunification with the children. Later on, in setting forth the factual basis for finding "reasonable efforts and compliance with specific steps," it found that the respondent "has made no sustained effort at rehabilitation" and "has rebuffed all [department] overtures to assist him," thereby highlighting the futility of the department's efforts. The evidence supports the court's finding that the respondent was never inclined to cooperate with the department or engage in rehabilitative programs. The court noted, and the record reflects, periods of time between the removal of the children in October, 2011, and the trial in February, 2013, in which Andrea and Jose participated in services to promote reunification, thereby expending at least some effort to comply with specific steps. This participation also reflects the department's willingness to continue to work up until the time of trial with willing participants like Andrea and Jose. As to the respondent, the court, expressing a desire to "give full weight to all the evidence," cites one rehabilitative service in which he engaged, an alcohol dependence treatment program in which the respondent engaged in the fall of 2012, after the petitions for termination of parental rights were filed, which the court noted "was likely required as a condition of his release and probation." In discussing the department's reasonable efforts and the respondent's compliance with specific steps, the court found that the respondent "was uncooperative and did not attempt to comply with any rehabilitative services save the [Treating] Alcohol Dependence program. . . . He has demonstrated no interest in the chil-

dren and has made no sustained effort at rehabilitation. He has rebuffed all [department] overtures to assist him. He is entirely, unreformed."

"Reviewing the court's findings and conclusions under the clearly erroneous standard . . . we cannot disturb its decision to terminate parental rights where the totality of the evidence, including reasonable inferences [drawn] therefrom, supports the [court's] verdict . . . ." (Citation omitted; internal quotation marks omitted.) *In re Sheena I.*, 63 Conn. App. 713, 725, 778 A.2d 997 (2001). Even were we to assume, as the respondent argues, that the court was bound to evaluate the department's efforts up until the conclusion of the trial, there is sufficient evidence in the record to support the reasonable inference that the respondent, right up to the conclusion of the trial, never altered, by word or deed, his expressed position that he did not wish to provide for his children or cooperate with the department. Given the evidence and findings of the court in the adjudicatory section of its memorandum of decision, the record reasonably supports the inference that the court's conclusion, in its reasonable efforts finding, that the respondent "was uncooperative and did not attempt to comply with any rehabilitative services save the [Treating] Alcohol Dependence program," which the respondent did not attend until November, 2012, after the adjudicatory date, was based on evidence it considered up until the date the trial concluded.

In the dispositional phase, in making the seven statutory findings required under § 17a-112 (k) as to the respondent in its articulation, including a second finding that the department made reasonable efforts at reunification, the court first restated all of its adjudicatory findings, which had been found by clear and convincing evidence earlier in its decision, and noted that in making the seven statutory findings, the court was restating the obvious. Thus, the court indicated that there was nothing in the evidence through to the conclusion of the trial that altered its perception, as stated in its finding regarding the department's reasonable efforts, that the respondent is "entirely unreformed," having demonstrated "no interest in the children" and made "no sustained effort at rehabilitation."

The futility of any attempts on the part of the department to engage with and involve the respondent in reunification services could not be any clearer. "The department is not required to provide reasonable efforts to a parent when the parent refuses to participate or engage in any of those efforts." *In re Christopher C.*, supra, 134 Conn. App. 478 n.7. The court's conclusion that the department made reasonable efforts to reunify the respondent with his children, all of which he rebuffed, is not clearly erroneous. Accordingly, the court did not err in terminating the respondent's parental rights.

The judgments are affirmed.

In this opinion the other judges concurred.

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79a-12, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

** January 16, 2014, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] Trial was held over two days, on February 19 and 21, 2012. The petitions for the termination of parental rights to four siblings, Kyara H. and Jahein H., and Trevon M. and Kahlil M., were consolidated for trial with hearings on the petitioner's motions for review of permanency plans for the four children and the respondent's motion to transfer guardianship of Kyara and Jahein to his girlfriend, Kimberly B. The respondent mother, Andrea K., also has appealed to this court from the trial court's judgments terminating her parental rights as to all four children. See *In re Kyara H.*, 147 Conn. App.     ,     A.3d     (2013). Jose M., the father of Trevon M. and Kahlil M., has not appealed the termination of his parental rights in his two children. For purposes of this opinion, Tyrone H. will be referred to as the respondent.

[2] The trial court specifically found that after the removal of Jahein from Andrea in 2005, Andrea participated in reunification services, and that after the removal of Kyara, Jahein and their younger sibling, Trevon, from Andrea in 2009, Andrea and Jose both participated in such services. The trial court noted that their cooperation resulted in the return of Andrea's children to her care. No such finding of compliance with reunification services or cooperation was made by the court regarding the respondent during these same periods, and there is no indication in the record that he engaged in any reunification services during the time periods subsequent to the filing of the prior neglect petitions affecting Kyara and Jahein.

[3] The court found that Andrea and Jose also had another child in 2012, who, as of the time of trial, was in the care of one of Andrea's relatives. That child is not the subject of Andrea's appeal.

[4] There was evidence that, in addition to being removed from Andrea's home on two separate occasions pursuant to the commissioner's motions for orders of temporary custody, Kyara and Jahein, with the acquiescence of the department, were voluntarily placed with a paternal uncle after the department reopened their cases due to domestic violence occurring between Andrea and Jose in February, 2009. This arrangement only lasted about one month and the uncle returned the children to Andrea without notifying the department. The department learned that the children were back in Andrea's care when Jahein told school staff that he played with a gun and bullets at Andrea's home.

[5] In addition, the record reflects that following his release, the respondent never informed the department he had changed his explicitly and consistently expressed position that he would not accept services from the department. Furthermore, he never argued that, had he only been provided with more guidance or additional programs from the department, he could have rehabilitated. He argued that the evidence was insufficient to show he had failed to rehabilitate.

[6] General Statutes § 17a-112 (j) provides in relevant part: "The Superior Court, upon notice and hearing as provided in sections 45a-716 and 45a-717, may grant a petition filed pursuant to this section if it finds by clear and convincing evidence that (1) the Department of Children and Families has made reasonable efforts to locate the parent and to reunify the child with the parent in accordance with subsection (a) of section 17a-111b, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts, except that such finding is not required if the court has determined at a hearing pursuant to section 17a-111b, or determines at trial on the petition, that such efforts are not required. . . ."

[7] The court granted the respondent's request for an articulation concerning its findings in the dispositional phase of the proceeding.

[8] General Statutes § 17a-111b (a) provides in relevant part: "The Commissioner of Children and Families shall make reasonable efforts to reunify a parent with a child unless the court (1) determines that such efforts are not required . . . or (2) has approved a permanency plan other than reunification pursuant to subsection (k) of section 46b-129."

[9] In the present case, there was no judicial determination that reunification efforts were inappropriate pursuant to General Statutes §§ 17a-110 (b) or

17a-111b, and although alleged by the commissioner, the court did not find that the respondent was unable or unwilling to benefit from reunification efforts.

[10] Practice Book § 35a-7 (a) provides: "In the adjudicatory phase, the judicial authority is limited to evidence of events preceding the filing of the petition or the latest amendment, except where the judicial authority must consider subsequent events as part of its determination as to the existence of a ground for termination of parental rights."

[11] The court did not expressly state whether its consideration of the department's efforts encompassed events only up to July 25, 2012, the filing date of the petitions, and the respondent did not seek articulation on this ground. Moreover, as we will discuss in part II of this opinion, a careful reading of the court's decision reflects that the court, in fact, appears to have considered evidence and made findings concerning reasonable efforts made up until the time of trial. Thus, the respondent has not demonstrated that the court limited its evaluation of the department's efforts to the date the petitions were filed. Although, under the circumstances of the present case, we need not determine whether the court was required to consider reasonable efforts until the time of trial, we note that "we read an ambiguous record, in the absence of a motion for articulation, to support rather than undermine the judgment. . . . Because the [defendant] did not seek the trial court's articulation in that regard, we must assume [that] the [court] acted properly." (Internal quotation marks omitted.) *State* v. *Reynolds*, 264 Conn. 1, 30 n.21, 836 A.2d 224 (2003), cert. denied, 541 U.S. 908, 124 S. Ct. 1614, 158 L. Ed. 2d 254 (2004). Absent an articulation regarding the legal basis for the trial court's decision, a claim of error cannot be predicated on the assumption that the trial court acted erroneously. See *State* v. *Richard S.*, 143 Conn. App. 596, 608, 70 A.3d 1110, cert. denied, 310 Conn. 912, 76 A.3d 628 (2013).

[12] We reject the commissioner's argument that the respondent did not preserve his claim that reasonable efforts were not made. The respondent did not need to specifically raise a claim as to the reasonable efforts requirement because it is an element that § 17a-112 (j) (1) requires be proven. Thus, it was not incumbent on the respondent to alert the court that it must apply the statute to the issue before it. See *Fenton* v. *Connecticut Hospital Assn. Workers' Compensation Trust*, 58 Conn. App. 45, 54, 752 A.2d 65 ("[j]udges are presumed to know the law . . . and to apply it correctly" [internal quotation marks omitted]), cert. denied, 254 Conn. 911, 759 A.2d 504 (2000).