******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# IN RE CAMERON W.*
## (AC 42678)

DiPentima, C. J., and Keller and Bright, Js.

*Syllabus*

The respondent mother appealed to this court from the judgment of the trial court terminating her parental rights with respect to her minor child, C. She claimed that the trial court erroneously concluded, pursuant to the applicable statute (§17a-112 [j] [1]), that the Department of Children and Families made reasonable efforts to reunify her with C, and that she was unable or unwilling to benefit from reunification efforts. The trial court found, inter alia, that because of the mother's involvement with the criminal justice system and repeated return to substance abuse, she had not sufficiently rehabilitated to the extent that she could assume a responsible position in C's life in view of his age and needs or within a reasonable period of time. *Held*:

1. The trial court properly found that the petitioner, the Commissioner of Children and Families, proved by clear and convincing evidence that the respondent mother was unable or unwilling to benefit from reunification efforts: in making that determination, the court relied primarily on its subordinate findings that, prior to the date on which the petitioner filed the petition, the mother, who was incarcerated, did not plan on assuming the role of a parent to C or want to work toward reunification with C and stated a desire that C be adopted, and the mother's claim that, in analyzing the issue of reasonable efforts at reunification under § 17a-112 (j), the court improperly failed to consider events that occurred after the adjudication date, which was the date on which the petitioner filed coterminous petitions for neglect and termination of parental rights, was unavailing, as it is a well settled principle that courts are required to consider only facts that occurred prior to the filing of a termination petition when making an assessment of whether reasonable efforts to reunify the parent with the child were made or whether there was sufficient evidence that a parent is unable or unwilling to benefit from reunification efforts, and, therefore, even though the mother argued that after the adjudication date she had made progress in terms of her sobriety, the court properly limited its analysis to events preceding the adjudication date; moreover, the court's finding that the mother was unwilling to benefit from reunification efforts was supported by clear and convincing evidence, as the evidence and testimony in the record showed that the mother had reported to social workers that her plan was for C to be adopted, she was working with a private adoption agency to effectuate the adoption, she met with adoptive parents of her choosing, she wanted to have visitations with C but did not want to work toward reunification, and the planned adoption did not occur because the putative father did not agree with it, not because the mother had changed her mind about the nature of her relationship with C, and in light of the mother's stated desire to pursue adoption, her reference to "services" in a statement to a social worker reasonably could have been interpreted as an indication that she wanted to receive services for her own benefit, as opposed to an indication that she wanted to work toward reunification with C.

2. It was not necessary for this court to reach the merits of the respondent mother's claim that the trial court improperly found that the department made reasonable efforts to reunify her with her child; the trial court found that the mother was unable or unwilling to benefit from reunification efforts and, alternatively, that the department made reasonable reunification efforts, and given that this court rejected the mother's challenge to the court's finding that she was unable or unwilling to benefit from reunification efforts and that, under § 17a-112 (j) (1), a court may grant a petition to terminate parental rights upon a finding that the parent is unable or unwilling to benefit from reunification efforts or that the department has made reasonable reunification efforts, the petitioner did not need to prove that reasonable reunification efforts were made.

Argued September 25—officially released November 26, 2019**

*Procedural History*

Coterminous petitions by the Commissioner of Children and Families to adjudicate the respondents' minor child neglected and to terminate the respondents' parental rights with respect to their minor child, brought to the Superior Court in the judicial district of Middletown, Juvenile Matters, where the court, *Sanchez-Figueroa, J.*, adjudicated the child neglected and committed the child to the custody of the petitioner; thereafter, the termination of parental rights petition was tried to the court; judgment terminating the respondents' parental rights, from which the respondent mother appealed to this court. *Affirmed.*

*Karen Oliver Damboise*, for the appellant (respondent mother).

*Cynthia E. Mahon*, assistant attorney general, with whom, on the brief, were *William Tong*, attorney general, and *Benjamin Zivyon*, assistant attorney general, for the appellee (petitioner).

*Opinion*

KELLER, J. The respondent, Shannon W., appeals from the judgment of the trial court terminating her parental rights with respect to her biological son, Cameron W. (Cameron), pursuant to General Statutes § 17a-112 (j) (3) (E). The respondent claims that the court improperly found that (1) she was unable or unwilling to benefit from reunification efforts and (2) the Department of Children and Families (department) made reasonable efforts to reunify her with her child.[1] We affirm the judgment of the trial court.

The record reveals the following relevant facts and procedural history. Cameron was born on February 21, 2018. On February 28, 2018, the petitioner, the Commissioner of Children and Families, filed coterminous petitions for neglect and for the termination of the parental rights of the respondent and Cameron's putative biological fathers.[2]

In the neglect petition, the petitioner alleged that Cameron was neglected as having been abandoned and because he was being denied proper care and attention physically, educationally, emotionally, or morally. See General Statutes § 46b-120 (4) (defining "neglected"). In the termination of parental rights petition, the petitioner alleged that termination of the respondent's parental rights with respect to Cameron was warranted pursuant to § 17a-112 (j) (3) (E), which provides in relevant part that a court may grant a petition for the termination of parental rights if it finds by clear and convincing evidence that "the parent of a child under the age of seven years who is neglected, abused or uncared for, has failed, is unable or is unwilling to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable period of time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child and such parent's parental rights of another child were previously terminated pursuant to a petition filed by the Commissioner of Children and Families . . . ." In the termination petition, the petitioner also alleged that the termination of the respondent's parental rights with respect to Cameron was in Cameron's best interests.[3] Additionally, in the termination petition, the petitioner alleged that the respondent was unable or unwilling to benefit from reunification efforts.

On February 26, 2018, two days prior to filing the petitions, the petitioner invoked a ninety-six hour hold on Cameron, while he was still hospitalized following his birth. On February 28, 2018, the court granted the petitioner's ex parte motion for an order of temporary custody, thereby vesting temporary custody of Cameron in the petitioner. The order of temporary custody was sustained at the initial hearing that took place on March 9, 2018, at which time the court ordered prelimi-

nary specific steps for the respondent.[4] On August 13, 2018, the petitioner filed a motion to amend the neglect petition and the petition for termination of parental rights by citing in Kyle Matthew B. as the putative father. On August 28, 2018, the court granted the petitioner's motion.

Prior to the start of the trial, which occurred on October 2, 2018, the respondent entered a written plea of nolo contendere with respect to the ground of the neglect petition that was based on the denial of proper care. The court accepted the plea, adjudicated Cameron to be neglected, and determined that committing Cameron to the custody of the petitioner was in his best interests.

During the trial on the petition for termination of parental rights, during which the respondent and Cameron were represented by counsel, the court received written evidence and heard testimony from the respondent; Michele Gargiulo, a social worker employed by the department; and Marie Levesque, a social work supervisor employed by the department. In its thorough memorandum of decision of January 29, 2019, the court set forth its findings of fact, which were made under the clear and convincing evidence standard. With respect to the respondent, the court found as follows: "[The respondent] is twenty-nine years old. . . . [The respondent] was raised in East Haven and Westbrook . . . together with her younger brother . . . . All went well for [the respondent] until her parents divorced when she was five years old. At the time of the divorce, [the respondent] primarily lived with her mother. The divorce was the beginning of [the respondent's] disrupted childhood. During the eighth grade, she began having conflicts with her mother and moved in with her father until his death in 2009. [The respondent] graduated from high school in 2007 and chose not to further her education. [The respondent] has never been married. [The respondent] has a total of three children, none of whom are in her care. All three children tested positive for substances at birth. [The respondent] has had a history with [the department] dating back to 2008 due to her issues with [substance] abuse.

"Shortly after high school, [the respondent] had her first child, Hallie W., who was born on July 8, 2007. On March 25, 2008, after [Hallie W.] was born, the maternal grandmother obtained custody of her . . . through the Westbrook Probate Court. On June 3, 2015, the maternal grandmother filed a petition for termination of parental rights with the Westbrook Probate Court. On May 10, 2016, [the respondent] consented [to the termination of her parental rights] and the court granted the [petition with respect to] Hallie W. as to [the respondent] and John Doe. On November 23, 2011, [the respondent] gave birth to her second child, Eric W., who tested positive for opiates at birth and experienced withdrawal

symptoms. On November 23, 2011, [the petitioner] was granted an [order of temporary custody] by the Middletown Superior Court for Juvenile Matters. On January 19, 2012, a termination of parental rights petition was filed by [the petitioner] and on February 3, 2012, the court accepted [the respondent's] consent to terminate her rights and ordered the termination of the parental rights as to Eric's putative father, John Doe.

"On February 21, 2018, [the respondent] gave birth to her third child, Cameron W., at Lawrence + Memorial Hospital in New London. [The respondent] reported that she did not know she was pregnant with Cameron until six months into the pregnancy and continued to use her drugs of choice, heroin and cocaine. When Cameron was born, [the respondent] had been incarcerated since November of 2017, and [the respondent] did not receive prenatal care prior to her incarceration. Because Cameron was exposed to heroin, cocaine, and alcohol in utero, he was diagnosed with [Neonatal] Abstinence Syndrome[5] at birth. Cameron tested positive for methadone at birth. It was not until [the respondent] was arrested and subsequently incarcerated that she involuntarily stopped using heroin and cocaine and was prescribed methadone. When she gave birth to Cameron on February 21, 2018, three months after her incarceration [began], [the respondent] tested positive for only methadone and benzodiazepine, as she had not been using heroin or cocaine due to her incarceration.

"Before the department invoked the ninety-six hour hold on Cameron, the social worker assigned to the case had a telephone conference with [the respondent], who had been released from the hospital on February 25, 2018, and was returned to the York Correctional Institute (York) where she had been incarcerated since November of 2017. At this time, [the respondent] was put on notice that [the department] had concerns regarding Cameron. [The respondent] reported to the [department] social worker that the plan for her son was adoption and that she had been working with Connecticut Adoption Center, a private adoption agency, to effectuate that plan. [The respondent] reported that she had met with the identified adoptive parents and that she continued to want adoption for Cameron. [The respondent] further stated that she wanted to have visitation with Cameron, but did not want to work towards reunification. The adoption plans were halted due to the putative father's (Alexander R.) disagreement with the adoption. On February 26, 2018, the adoption social worker contacted [the department] explaining that both parents were incarcerated, that there was no agreement with the adoption, and that the child would need to be placed with a family. After she learned that the plans for adoption would not happen, [the respondent] was unable to or refused to provide [the department] with names of potential resources for Cameron. Although her mother had adopted her first born child, [the respon-

dent] did not believe that the maternal grandmother could be a resource due to their troubled relationship. [The respondent] was adamant that she did not want her mother involved as a possible placement for Cameron. In spite of [the respondent] not wanting the child placed with her mother, [the department] did its due diligence and determined that, for independent reasons, [the] maternal grandmother could not be a resource for Cameron.

"[The respondent] was unsure of the identity of Cameron's father and named two potential fathers who were later tested and were each excluded as probable fathers. . . .

"[The respondent] is a convicted felon and has an extensive criminal and substance abuse history dating back to 2009. [The respondent] has admitted to the use of cocaine and heroin. [The respondent's] criminal charges included: disorderly conduct, failures to appear, violations of probation, possession of a controlled substance, possession of narcotics, and several larceny in the sixth degree charges. Most recently, [the respondent] was arrested on November 14, 2017, and charged with smuggling, possession of a controlled substance, criminal impersonation, and [possessing] drug paraphernalia. [The respondent] was incarcerated at the York facility with [the department of correction] when she gave birth to Cameron on February 21, 2018. [The respondent] was incarcerated from November, 14, 2017, and released in June of 2018.

"During her incarceration at York, the department was unable to provide [the respondent] with any rehabilitative services as she was not available to comply with the services. To her credit, however, [the respondent] took advantage of programs offered to her by the [department of correction] and participated in programs such as Stride, which focused on employment and vocational services; Narcotics Anonymous (NA) and Alcoholics Anonymous (AA) meetings; and she participated in a child development program. In mid-June, 2018, [the respondent] was released to a [department of correction] halfway house, Next Steps, in Willimantic. Next Steps is a structured setting, supervised and restricted by the [department of correction], and she was not allowed to come and go in the community. [The respondent] engaged in services offered by [the department] such as early recovery group therapy, trauma based group therapy, individual counseling and medication management through Perceptions. As a direct result of her incarceration, [the respondent] was not available to be referred to treatment services. Therefore, [the respondent] was unable to benefit from any treatment services [the department] could have provided.

"On August 20, 2018, [the respondent] was moved to Healthy Lifestyles, a sober house in New London, where

she continued with the services she was receiving and became employed. The sober house is privately run and not supervised by [the department] and it allowed [the respondent] the flexibility to go into the community. [The respondent] testified that she has been prescribed Vivitrol monthly injections; a medication used to prevent relapse in opioid dependent patients. The department made a referral for [the respondent] to SCADD (Southeastern Council on Alcohol and Drug Dependence) for [substance] abuse and mental health rehabilitation and evaluations.

"During her incarceration, [the respondent] received monthly visitation with Cameron and upon her release from incarceration and the [department] halfway house, the department increased the frequency of visits to weekly. Although the visits have gone well with appropriate interaction, there is no clear bond between [the respondent] and Cameron. To her credit, however, [the respondent] has been consistent with the visits both during and after her incarceration. It has been reported that the visits are enjoyed by both Cameron and [the respondent].

"[The respondent's] substance abuse history includes use of heroin and cocaine, which she reported she began using eight to nine years ago and continued to use until the time of her incarceration on November 14, 2017. [The respondent] reports that she has been sober for ten months from the time she was arrested on November 14, 2017, and has remained sober up until the trial date of October 2, 2018. [The respondent] testified that she had, some years ago, maintained a six month period of sobriety while in the community. After those six months, [the respondent] relapsed and returned to the drug use. [The respondent] explained that this current attempt at sobriety is different because she is doing it for herself and for Cameron and not at the insistence of her family. [The respondent's] Exhibit A, a letter from the sober house, Healthy Lifestyles, showed that [the respondent] had two recent negative urine drug screens on September 17, 2018, and on September 30, 2018, only two weeks prior to the trial date. To her credit, [the respondent] has participated in substance abuse recovery and relapse prevention programs while in the halfway house and during her current stay in the sober house. [The respondent] testified that she continues to participate in NA and AA meetings on a weekly basis. [The respondent] has obtained employment and expressed a desire to be reunified with Cameron.

"At trial, [the respondent] testified that she made plans for adoption based on her belief that she did not stand a chance to keep Cameron or care for him given her history with [the department]. [The respondent] has had two other children for whom her parental rights were previously terminated. [The respondent] testified

that after Cameron was born, her plans changed and she wanted to be reunified with her son. Contrary to her testimony, the evidence shows that [the respondent] had no plans to be reunified with Cameron as she unilaterally initiated the plans to have him adopted prior to the intervention of [the department].''

The court set forth findings of fact with respect to Cameron, as follows: ''[Cameron] was born on February 21, 2018, and is now eleven months old. At the time of the trial, Cameron was seven months old. He was born to [the respondent] and John Doe at Lawrence + Memorial Hospital in New London . . . . Cameron has been in [the department's] care since February 26, 2018, when he was placed in a legal risk [department] foster family in Connecticut where he presently remains. Cameron was born while his mother was incarcerated at the York facility. Cameron was diagnosed with Neonatal Abstinence Syndrome and having Fetal Alcohol [Syndrome],[6] as he was exposed to heroin, cocaine, and alcohol in utero and experienced withdrawal after birth. While in the hospital, Cameron was prescribed morphine to assist him with the withdrawal symptoms and was connected to a Continuous Positive Airway Pressure (CPAP) machine for the first eighteen hours of his life. Cameron requires a competent caregiver that will meet his specialized needs.

''The foster mother reports that Cameron is a happy baby who is developing appropriately. Cameron was eating and sleeping well with a few struggles with constipation that the foster mother properly addressed. It was reported that Cameron had been assessed by Birth to Three in April, 2018, and was found not to be eligible. The foster mother reports that Cameron has no developmental issues or concerns. The foster family has provided Cameron with a safe, secure, and caring home life, and he has bonded well to his foster mother and family.

''Cameron is adjusting well to daycare and the KinderCare staff also reports that Cameron is a happy baby and they have not observed any developmental concerns. All of Cameron's medical, dental, emotional, and specialized needs are being met and [he] is medically up to date. Cameron is thriving in his foster family's care. The foster family [is] willing and able to adopt Cameron if the reunification efforts made are not successful.

''Cameron visited with [the respondent] on a monthly basis during her incarceration, and then on a weekly basis when she was released to the sober house. It was reported that both [the respondent] and Cameron enjoyed the visits. Cameron has a happy disposition and appears to enjoy the visits with [the respondent]. [The respondent] engages Cameron and is reportedly appropriate during her visits. Cameron continues to look to his foster family for all of his needs. Cameron has never seen his father, as John Doe's identity is

unknown and his whereabouts remain unknown. John Doe has not come forward to be assessed or to offer himself as a resource for Cameron."

In setting forth its determinations with respect to the adjudicatory phase of the trial, the court, citing relevant case law and Practice Book § 35a-7, observed that, in the adjudicatory phase, it was limited to making its assessment on the basis of facts preceding the filing of the petition for termination of parental rights or the latest amendment thereto. Then, the court evaluated whether, pursuant to General Statutes § 17a-112 (j) (1),[7] the department met its burden of proving by clear and convincing evidence that it had made reasonable efforts to locate the respondent and to reunify the respondent and Cameron or, in the alternative, that the respondent was unable or unwilling to benefit from reunification efforts. After setting forth relevant legal principles, the court stated as follows: "[The department] has proven by clear and convincing evidence that it used reasonable efforts to locate [the respondent]. [The respondent] was found on March 9, 2018, to have been served in-hand with the [termination of parental rights] petition and has appeared in this action and was represented by counsel . . . .

"[The department] has alleged as to [the respondent] that at the time it filed its coterminous petitions, it made reasonable efforts to reunify [the respondent] with her child, and in the alternative, has alleged that [the respondent] was unwilling to benefit from reunification efforts. The court finds that this allegation was based on [the respondent's] status at the time of the filing . . . of the [termination of parental rights] petition. [The respondent] was incarcerated, and according to the [department's] investigation protocol, the conversations with [the respondent] were about her intentions to put the child up for adoption. The adoption process was only halted due to the putative father's disagreement, and not the department's intervention. [The respondent] wanted the child adopted and she was unwilling and unable to benefit from reunification efforts. In fact, the evidence shows that [the respondent] explicitly informed the adoption social worker that she wanted visitation with the child, but did not want to work toward reunification with the child. The court finds that [the respondent] was unable and unwilling to take advantage of any services [the department] could provide her, as she had no plans to raise Cameron and was not available for Cameron due to her incarceration. However, the specific steps provided to [the respondent] clearly guided her to take advantage of all programs offered to her by [the department of correction]. Minimal or no services were provided to [the respondent] due to her incarceration and her unwillingness to benefit from the efforts to reunify her with her child. She, however, engaged in services offered to her by [the department of correction] as she was unavail-

able to take advantage of any referrals and services [that the department] could provide while she was incarcerated. [The respondent] was therefore unable to benefit from [the department's] reunification efforts.

"The court acknowledges that incarceration alone cannot be the basis for terminating parental rights, but observed, nevertheless, that [the respondent's] incarceration posed restraints on her ability to visit more frequently with her child and meet his needs, particularly given his significant medical issues at birth.

"It was evident that [the respondent] had continued to use substances for the last eight to nine years which has resulted in the termination of her parental rights to her two older children. [The respondent] also continued her involvement with the criminal justice system that resulted in three different periods of incarceration with the most recent being in November, 2017. In spite of [the respondent's] presenting problems with incarceration, long history of involvement with the criminal justice system, and her ongoing [substance] abuse, [the department] attempted in reunifying [the respondent] with her child and provided her with visits with Cameron during and after her incarceration at York. The court finds that [the department] has proven by clear and convincing evidence that it made reasonable efforts under the circumstances to reunify Cameron with [the respondent] even when [the respondent] made it clear that she had no desire to work towards reunification. The court further finds that [the respondent] was unable or unwilling to benefit from the reunification efforts made by [the department]. The court notes that the law does not require a continuation of reasonable efforts on the part of [the department] when such efforts will be futile." (Internal quotation marks omitted.)

The court observed that the petitioner brought the termination of parental rights petition pursuant to § 17a-112 (j) (3) (E), on the ground that the respondent failed to rehabilitate. After setting forth relevant legal principles, the court determined whether the petitioner had met its burden of proving that this statutory ground existed by clear and convincing evidence. The court's findings, which are not challenged in this appeal, are as follows: "The evidence here proves . . . convincingly that Cameron has been found to have been neglected. As noted above, Cameron was adjudicated neglected on October 2, 2018. Cameron is under the age of seven years old as he was born on February 21, 2018. It is also established that [the respondent's] rights to another child were terminated. In fact, [the respondent's] rights to two other children were terminated, as discussed above. The evidence clearly and convincingly shows that [the respondent] is unable to achieve such a degree of personal rehabilitation as would encourage the belief that within a reasonable period of time, considering the age and needs of the child, she could

assume a responsible position in the life of . . . Cameron. . . .

"The evidence clearly shows that [the respondent] has a repeated pattern in her history with her involvement in the criminal justice system, repeated attempts at sobriety, and repeated return to [substance] abuse. At the time the petitions were filed, [the respondent's] primary presenting problems arose from her incarceration, involvement with the criminal justice system, her [substance] abuse issues, and her inability to care for and to provide for the needs of her infant child, Cameron. The court acknowledges that [the respondent] has satisfied a great deal of her specific steps by her engagement in the services and programs she was provided at [the department of correction] while she was incarcerated, during her time at the halfway house, and her current involvement at the sober house. However, compliance with the specific steps is not the equivalent to rehabilitation. The parent's compliance with the court ordered expectations or specific steps is relevant, but not dispositive to the rehabilitation finding. . . .

"To her credit, [the respondent] has made progress as she is employed and has reportedly tested negative [for] substances on only two shown instances just a few weeks prior to the trial date of October 2, 2018. The evidence shows that [the respondent] tested negative for substances on September 17, 2018, and again on September 30, 2018. [The respondent] reports to have been sober for the last ten months, from November, 2017, and has plans to remain sober. Certainly, this court applauds [the respondent's] efforts and hopes that she will maintain her sobriety for her own sake. The court acknowledges that it has been the longest time of sobriety for [the respondent] in the last eight to nine years. However, the court also finds that the first six months of [the respondent's] sobriety began when she was arrested and subsequently incarcerated. Although her sobriety began involuntarily, to her credit, [the respondent] has recently demonstrated a desire to maintain her sobriety. The court further finds that [the respondent] has only been sober in the community for two months from August 20, 2018, to the trial date of October 2, 2018.

"[The respondent] remains under the supervision of a sober house, and given [the respondent's] long history of drug dependency, two months in the community is insufficient time for the court to find that she has achieved the level of personal rehabilitation that would encourage this court to believe that she would be able to assume a responsible position in Cameron's life. [The respondent], through her testimony, has expressed love for Cameron and a desire to be reunified with her child. It is clear that [the respondent] has a renewed desire to parent Cameron. However, the fact that the respondent may love the child does not in itself show rehabilitation.

. . . Unfortunately, given her history of significant involvement with the criminal justice system and her long history of [substance] abuse issues and the totality of the evidence, the court does not find that [the respondent] has rehabilitated to a level where she can take care of Cameron either now or in the foreseeable future. There was no evidence presented to show that [the respondent] has gained the necessary insight and ability to care for her child given his age and needs within a reasonable period of time. . . . [The respondent] has very recently attempted to reach a level of sobriety, and although the court is hopeful that she is able to maintain it, the court cannot draw a conclusion of rehabilitation as her sobriety is in its very early stages. The court is not convinced that [the respondent's] current attempt at sobriety rises to the level necessary for a finding of rehabilitation. Cameron cannot wait to see if [the respondent] can maintain her sobriety, on her own, when she is not in a highly structured and monitored environment.

"The child is in need of a permanent and competent caregiver who will provide permanency, care, safety, and well-being. The child needs permanency, and to provide [the respondent] additional time to prove that she has reached the level of rehabilitation necessary to care for Cameron is not in his best interest. Providing [the respondent] more time is not consistent with Cameron's age and needs for structure, nurturing and permanency in his young life. Cameron has been in [the department's] care for his entire young life since he was discharged from the hospital on February 26, 2018, a mere five days after his birth.

"Thus, the evidence clearly and convincingly establishes that as of the end of the trial on this matter, [the respondent] had *not* sufficiently rehabilitated to the extent she could assume a responsible position in Cameron's life in view of his age and needs or within a reasonable period of time. Accordingly, the court finds that, based upon the credible testimony and documentary evidence presented, and pursuant to the requirements of General Statutes §§ 17a-112 (j) (1) and 17a-111b (a), [the department] has met its burden of proof by the rigorous standard of clear and convincing evidence that [the respondent] has failed to achieve the degree of rehabilitation which would reasonably encourage the belief that at some future date she can assume a responsible position in her child's life. The court, therefore, finds that [the respondent] has failed to and is unable to rehabilitate within a reasonable time, as it has been statutorily defined and has been proven by clear and convincing evidence." (Citations omitted; emphasis in original; internal quotation marks omitted.)

With respect to the dispositional phase of the trial, the court stated in relevant part, as follows: "The court concludes that it is in the best interest of the child to

terminate the parental rights of the respondent . . . . The court finds that the evidence is clear and convincing that the only way this child will find stability, continuity, development, and growth is through permanency. There is not enough evidence that [the respondent] will be able to rehabilitate at any time in the foreseeable future. Although she has shown some movement towards rehabilitation in the time since the child was placed in [the department's] care, that time is not enough given [the respondent's] extensive history with the criminal justice system and her long history of [substance] abuse. The court further finds that two months of sobriety after her release from the structured environment of incarceration and a halfway house, both of which are supervised by [the department of correction], is insufficient time to adequately assess the necessary level of personal rehabilitation. The child has now been in foster care for all of his life and is in need of stability and permanency in order to grow and develop in a healthy manner. While [the respondent] has been compliant with her visitations and has created a relationship with the child during the visits, it does not rise to the level of a parent-child relationship or the parent-child bond that is formed from the day-to-day caring and providing for a child. [The respondent's] testimony showed a desire to parent her child and to love him. As stated above, love is not enough to show this court that she has rehabilitated. Moreover, [the respondent] was unable [or] unwilling to form a parental bond. [The respondent] has not [established] the parent-child relationship that is necessary to enable her to provide Cameron with stability and an environment that would foster his growth and development, all due to her extensive history of [substance] abuse and incarceration. [The respondent's] circumstances today are the same circumstances she was in during 2007 and again in 2011. [The respondent's] circumstances have not changed for the last eight to nine years. To allow [the respondent] further time to rehabilitate to show that she may possibly assume a responsible position in Cameron's life is not fair to Cameron, and more importantly, the court finds that it is not in his best interest. Therefore, the court finds that it is in the child's best interest to terminate [the respondent's] parental rights."

The court set forth findings with respect to the seven criteria set forth in General Statutes § 17a-112 (k).[8] With respect to the first criterion, the court found: "As discussed above, the department has made reasonable efforts to work towards reunification of Cameron with [the respondent] and putative father. [The department] has offered timely and appropriate services since the opening of the case in an effort to facilitate reunion with Cameron. However, [the respondent] was very clear and adamant that she did not want reunification but wanted adoption for the child. Initially, the department had been unable to offer [the respondent] appro-

priate services toward reunification of Cameron, as she was incarcerated . . . . The department has provided [the respondent] with monthly supervised visits that were increased to weekly supervised visits with Cameron. All of the recommended services were reasonable and appropriate, and offered on a consistent, timely and sufficient basis.''

With respect to the second criterion, the court found: "As discussed above, the department offered reasonable efforts in order to work towards reunification of Cameron with [the respondent] or putative father, as [the respondent] was incarcerated at the time. [The respondent] was unable to benefit from any efforts as she had no intentions of caring for Cameron. . . . However, [the department] made efforts to provide [the respondent] visits during and after her incarceration. The court finds that [the respondent] has failed to meet her own expected reasonable efforts to benefit from [the department's] reasonable efforts. The findings made above are incorporated herein by reference.''

With respect to the third criterion, the court found: "The Superior Court for Juvenile Matters of Middletown offered specific steps for [the respondent] on February 28, 2018. Due to [the respondent's] incarceration, she was unable to fulfill the court ordered specific steps. [The respondent], however, took advantage of programs offered to her while under the strict supervision of [the department of correction].''

With respect to the fourth criterion, the court found: "Cameron is now eleven months old and does not fully understand why he is in foster care. Cameron has been in [the department's custody] for all of his short life and he looks to his foster parents to meet his every need. Although Cameron has supervised visits with [the respondent], both while she was incarcerated and after her release, he has bonded with his foster family and looks to them to have his needs met. Cameron enjoys his visits with [the respondent], but he does not have a parent-child bonded relationship with her. . . . Cameron is in need of a home and caretaker who understands his needs and responds to him in a consistent nurturing and developmentally appropriate manner. The foster parents are ready, willing, and able to be his permanent caregivers, and they are ready and willing to adopt Cameron.''

With respect to the fifth criterion, the court reiterated its finding that Cameron was born on February 21, 2018, and that he was nearly eight months old at the time of the trial.

With respect to the sixth criterion, the court stated: "As discussed above, [the respondent] was incarcerated and was offered monthly supervised visits with Cameron. After her release from incarceration, [the respondent] was offered supervised visits on a weekly basis.

[The respondent] has failed to sufficiently adjust her circumstances, conduct, or conditions to make it in the best interest of the child to be reunified with [the respondent] in the foreseeable future. Although [the respondent] has consistently visited with the child and has made some progress in achieving a level of sobriety, the short period of sobriety does not rise to the level of rehabilitation. [The respondent] has been unable or unwilling to sufficiently address the child protection concerns and is not in a position to provide Cameron with a safe, permanent and stable home environment where he would be able to thrive."

With respect to the seventh criterion, the court stated: "The court finds there is no credible evidence provided to show that the parents have been prevented from maintaining a meaningful relationship with Cameron. [The department] has encouraged [the respondent] to maintain a relationship with the child. In fact, [the department] requested [the respondent] to provide names of relatives or other potential resources for Cameron, but she focused only on her desire to have Cameron adopted. No unreasonable act or conduct by any person or agency or by the economic circumstances of the parents has prevented [them] from maintaining a meaningful relationship with [their] child. . . . For [the respondent], it has only been through her own actions and circumstances of incarceration and [substance] abuse that caused her to fail to maintain a meaningful relationship with her child. At the time of Cameron's birth, [the respondent] was not able to maintain a meaningful relationship with her son and therefore not able to create an emotional bond with him."

Thereafter, the court terminated the parental rights of the respondent with respect to Cameron.[9] This appeal followed. Additional facts will be discussed as necessary.

I

We first address the respondent's claim that the court improperly found that she was unable or unwilling to benefit from reasonable efforts to reunify her with her child. We disagree.

As we have discussed previously in this opinion, in this nonconsensual termination of parental rights petition brought under § 17a-112, the petitioner alleged that the respondent was unable or unwilling to benefit from reunification efforts. With respect to the issue of whether the respondent was unable or unwilling to benefit from reunification efforts, the court, focusing on events that occurred prior to the date on which the petitioner filed the petition, concluded that the petitioner sustained her burden of proof by clear and convincing evidence. We previously have set forth the court's analysis of the issue. It suffices to observe that, the court relied primarily on its subordinate findings

that, prior to the date on which the petitioner filed the petition, the respondent, who was incarcerated, did not plan on assuming the role of a parent to Cameron, she desired that he be adopted, and she did not want to work toward reunification with him.[10]

The respondent broadly asserts that this court should review the court's determination that she was unable or unwilling to benefit from reunification efforts for evidentiary sufficiency. Yet, we observe that, in challenging the court's determination that she was unable or unwilling to benefit from reunification efforts, the respondent does not argue distinctly before this court that, in light of the evidence, the court erroneously found that, prior to the adjudication date,[11] she did not plan on parenting Cameron and was unwilling to work toward reunification with him. We do not interpret the respondent's arguments to suggest that the subordinate factual findings specifically made by the court and set forth in its memorandum of decision were not based on the evidence related to events preceding the adjudication date. In substance, the respondent argues before this court that the court's ultimate finding, that she was unable or unwilling to benefit from reunification efforts, was erroneous because (1) the court failed as a matter of law to consider events that occurred after the adjudication date and (2) the court's finding that reunification efforts would have been futile is not supported by clear and convincing evidence in light of, among other things, the court's findings concerning events that transpired after the adjudication date. The respondent draws our attention to the evidence, as well as the court's findings, that, after the adjudication date, she made progress in terms of her sobriety and assimilating in the community. Thus, she relies, in part, on the court's detailed findings, as set forth previously in this opinion, that she took advantage of several programs that were offered to her by the department of correction, she participated in visitations with Cameron, and she achieved a period of sobriety for several months following her release from prison.

As a threshold matter, we address the respondent's argument that, in analyzing the issue of reasonable efforts under § 17a-112 (j),[12] the court improperly failed to consider events that occurred *after* the adjudication date. We observe that, in the present case, the adjudication date is February 28, 2018, the date on which the petitioner filed the coterminous petitions for neglect and for termination of parental rights.[13] In this appeal, the respondent does not dispute that the adjudication date is the date on which the petitioner filed the petition.

We reject the respondent's argument that the court's failure to have considered events following the adjudication date was contrary to § 17a-112 (j) or controlling precedent. "In order to terminate parental rights under § 17a-112 (j), the [petitioner] is required to prove, by

clear and convincing evidence,[14] that [the department] has made reasonable efforts . . . to reunify the child with the parent, unless the court finds . . . that the parent is unable or unwilling to benefit from reunification [efforts] . . . . [Section 17a-112] imposes on the department the duty, inter alia, to make reasonable efforts to reunite the child or children with the parents. The word reasonable is the linchpin on which the department's efforts in a particular set of circumstances are to be adjudged, using the clear and convincing standard of proof. Neither the word reasonable nor the word efforts is, however, defined by our legislature or by the federal act from which the requirement was drawn. . . . [R]easonable efforts means doing everything reasonable, not everything possible." (Footnote added; internal quotation marks omitted.) *In re G.S.*, 117 Conn. App. 710, 716, 980 A.2d 935, cert. denied, 294 Conn. 919, 984 A.2d 67 (2009).

"A hearing on a petition to terminate parental rights consists of two phases, adjudication and disposition. . . . In the adjudicatory phase, the trial court determines whether one of the statutory grounds for termination of parental rights . . . exists by clear and convincing evidence. If the trial court determines that a statutory ground for termination exists, it proceeds to the dispositional phase. In the dispositional phase, the trial court determines whether termination is in the best interests of the child." (Internal quotation marks omitted.) *In re Shaiesha O.*, 93 Conn. App. 42, 47, 887 A.2d 415 (2006).

"[I]n determining whether the department has made reasonable efforts to reunify a parent and a child or whether there is sufficient evidence that a parent is unable or unwilling to benefit from reunification efforts, the court is required in the adjudicatory phase to make its assessment *on the basis of events preceding the date on which the termination petition was filed.* . . . This court has consistently held that the court, [w]hen making its reasonable efforts determination . . . *is limited to considering only those facts preceding the filing of the termination petition or the most recent amendment to the petition . . . .*" (Citations omitted; emphasis added; footnote omitted; internal quotation marks omitted.) *In re Kyara H.*, 147 Conn. App. 855, 870–71, 83 A.3d 1264, cert. denied, 311 Conn. 923, 86 A.3d 468 (2014); see also *In re Joseph M.*, 158 Conn. App. 849, 862, 120 A.3d 1271 (2015) (stating well settled principle that courts are required to consider only facts that occurred prior to filing of termination petition when making reasonable efforts assessment); *In re Kylik A.*, 153 Conn. App. 584, 596, 102 A.3d 141 (same), cert. denied, 315 Conn. 902, 104 A.3d 106 (2014); *In re Paul O.*, 141 Conn. App. 477, 484, 62 A.3d 637 (same), cert. denied, 308 Conn. 933, 64 A.3d 332 (2013). Practice Book § 35a-7 (a) codifies this procedural rule by providing: "In the adjudicatory phase, the judicial authority is lim-

ited to evidence of events preceding the filing of the petition or the latest amendment, except where the judicial authority must consider subsequent events as part of its determination as to the existence of a ground for termination of parental rights."

The respondent relies primarily on *In re Oreoluwa O.*, 321 Conn. 523, 139 A.3d 674 (2016), to demonstrate that, with respect to the issue of reasonable efforts under § 17a-112 (j), the court should not have confined its analysis to events that occurred prior to the adjudication date. We conclude that the respondent interprets our Supreme Court's reasoning in that case too broadly. In *In re Oreoluwa O.*, our Supreme Court determined that, in light of the unique circumstances that existed in that case, it was not improper for the trial court to have considered events subsequent to the adjudication date. Id., 544. The court explained its rationale for this conclusion, which was heavily influenced by the fact that, as of the adjudication date, "there was uncertainty as to when [the child] would be cleared to travel [to be with the respondent] and his medical status was in a state of flux." Id., 543–44. Such obvious factors that could have affected the practicality of reunification efforts, however, do not exist in the present case and, thus, do not warrant a departure from the general rule. Accordingly, we do not conclude that it is appropriate to extend a case specific analysis in *In re Oreoluwa O.*, to the present case.[15]

Having determined that the court properly limited its analysis to events preceding the adjudication date, we next consider whether the court's finding that the respondent was unwilling to benefit from reunification efforts was supported by clear and convincing evidence. Our Supreme Court has clarified the standard of review that governs our analysis of a court's finding with respect to reasonable efforts pursuant to § 17a-112 (j): we review the court's "subordinate factual findings for clear error" and then "we review the trial court's ultimate determination that a respondent parent was unwilling or unable to benefit from reunification services for evidentiary sufficiency . . . ." *In re Gabriella A.*, 319 Conn. 775, 790, 127 A.3d 948 (2015); see also *In re Elijah C.*, 326 Conn. 480, 501, 165 A.3d 1149 (2017) (same).

The court's dispositive subordinate factual findings in the present case included the findings that, prior to the adjudication date, the respondent reported to department social workers that her plan was for Cameron to be adopted, she was working with a private adoption agency to complete the adoption, she had met with the adoptive parents of her choosing, and "she wanted to have visitations with Cameron, but did not want to work towards reunification." The court also found that the adoption plan formulated by the respondent was thwarted because the putative father, Alexan-

der R., disagreed with the plan. Subsequently, the respondent was unable or refused to provide the department with names of other potential resources for Cameron.

"A factual finding is clearly erroneous when it is not supported by any evidence in the record or when there is evidence to support it, but the reviewing court is left with the definite and firm conviction that a mistake has been made." (Internal quotation marks omitted.) *In re Bianca K.*, 188 Conn. App. 259, 269, 203 A.3d 1280 (2019). In light of the following evidence, we conclude that the court's subordinate factual findings are not clearly erroneous.

Among the evidence before the court was a document titled "Investigation Protocol" that reflected some of the information that was learned by department social workers during their investigation in the present case. Among the relevant information set forth therein were intake notes that reflected that the department became involved in the case after a social worker at Lawrence + Memorial Hospital reported that Cameron may be a neglected child. The department learned that the respondent planned for a private adoption, but that Cameron's putative father refused to consent to the adoption. According to the notes, the respondent "still wants the baby to be adopted and was tearful about this change in plan."

There are additional notes concerning a telephone call between Gargiulo and the respondent, who was then residing at York, on February 26, 2018. Gargiulo noted that the respondent stated that "she did not have any other resources than the chosen adoptive couple" and that the respondent "did not have a plan to parent Cameron . . . ."

Another entry in the department's notes sets forth information concerning a telephone conference between the respondent and one or more department social workers on February 26, 2018. It reflected the following information: "[The respondent] reported that she would like to engage in services and establish a period of sobriety, [six] months is the longest she has been able to be sober. [The respondent] reported that her plan was for her son to be adopted and she has been working with an adoption agency to effectuate this plan. She reported that she has met the adoptive parents and this continues to be her wish for them to be able to adopt her son. [The respondent] reported that she would like to be able to visit with her son but she does not want to work towards reunification. [The respondent] reported she provided her adoption [social worker] with [information pertaining to putative father Alexander R.] approximately two months ago. She reported that it was her understanding that the prison failed to reach out to her adoption worker."

Additional information learned by the department during a telephone conference with the respondent on February 26, 2018, includes the following facts: "[The respondent] indicated she wanted to use the adoptive family she had chosen and no one else. She indicated she didn't want her baby in foster care. She stated [that] the father is [Alexander R.] and she didn't have his date of birth. . . . She stated she met . . . the adoptive family she chose only [two] times. She stated she didn't want him part of foster care and she chose them for her baby. [The department social worker] asked what traits she liked best about them. She stated she didn't know and she just did. She stated they knew her wishes and knows they would have given him a good life. She indicated she wanted ongoing contact with the baby after adoption."

A social study that was prepared by department social workers on April 26, 2018, and filed in support of the coterminous petition, was also admitted as evidence. Among the matters discussed in the social study was a reference to the fact that the respondent's plan was to pursue a private adoption for Cameron, but that such plan did not move forward because Alexander R. disagreed with such plan.

At trial, Gargiulo testified that the respondent indicated to her that her plan for Cameron was not to work toward reunification with him, but to pursue adoption.

Most importantly, during the respondent's trial testimony, she testified in relevant part that, once she realized that she was pregnant during her sixth month of pregnancy, she wanted to "get sober" but did not have any other plans for her child. She testified that she gave birth to Cameron while she was incarcerated and, in the period leading up to Cameron's birth, she had arranged for him to be adopted. She testified, however, that problems arose "from the father's side" concerning the adoption and that it "fell through." Specifically, the respondent explained that she initially had identified Alexander R. as Cameron's putative father, but that testing later revealed that he was not, in fact, Cameron's father. She testified that, "once . . . it came back that he wasn't his father, the adoption fell through . . . ."

The respondent also testified that, on February 26, 2018, one or more representatives of the department spoke with her about plans for Cameron, including alternate plans for adoption, but that she replied that she did not agree with these plans. The respondent testified that, after her plan for Cameron to be adopted proved to be unsuccessful for the reasons she had explained, which were related to Alexander R., she recognized that she wanted to be reunited with Cameron.

Among its findings, the court found that the person first identified by the respondent as Cameron's putative father, Alexander R., "was properly served by certified

mail on March 9, 2018, and on March 23, 2018, was appointed counsel and a paternity test was ordered. On April 27, 2018, the court received and reviewed the results of the DNA tests . . . . On this date, Alexander R. was found not to be the father of the minor child and a finding of nonpaternity issued . . . . The respondent Alexander R. and his appointed counsel were removed from the case." These findings concerning Alexander R. are not in dispute.

In light of these findings concerning Alexander R., and the respondent's testimony that she had a change of heart with respect to being reunited with Cameron only *after* it was discovered that Alexander R. was not Cameron's father on April 27, 2018, the evidence supported a finding that the respondent changed her position with respect to reunification well after the adjudication date of February 28, 2018.[16] Indeed, there was no evidence to support a finding that, prior to February 28, 2018, the respondent no longer wanted to pursue adoption, as she had made known to the department, or that she wanted to pursue reunification.

Next, we consider the court's ultimate finding that the respondent was unable or unwilling to benefit from reunification efforts. The court observed that the respondent's incarceration significantly hampered her ability to take advantage of services and referrals that could be provided to her by the department, as well as her ability to visit more frequently with Cameron. Primarily, however, the court focused on its subordinate findings that, prior to the adjudication date, the respondent attempted, unsuccessfully, to effectuate an adoption and that she had expressed her desire not to be reunified with Cameron.

As our Supreme Court explained in *In re Gabriella A.*, supra, 319 Conn. 789, in evaluating a trial court's ultimate finding that the respondent was unable or unwilling to benefit from rehabilitation efforts for evidentiary sufficiency, we ask "whether the trial court could have reasonably concluded, upon the facts established and the reasonable inferences drawn therefrom, that the cumulative effect of the evidence was sufficient to justify its [ultimate conclusion]. . . . When applying this standard, we construe the evidence in the light most favorable to sustaining the judgment of the trial court. . . . [An appellate court does] not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached. . . . [Rather] every reasonable presumption is made in favor of the trial court's ruling." (Citations omitted; internal quotation marks omitted.)

The facts established in the present case reflected that, as of the adjudication date, the respondent did not intend to play a parental role in Cameron's life and that she communicated this fact to department social workers. The facts showed that the respondent wanted

to end her parental relationship with Cameron in a very obvious manner, by having Cameron adopted, and that she took steps to effectuate this plan for a private adoption by a couple of her choosing. As the court found, the planned adoption did not occur because the putative father, Alexander R., did not agree with it, not because the respondent had changed her mind about the nature of her relationship with Cameron. We recognize that there was evidence in the form of the department's investigative notes, that, prior to the adjudication date, the respondent stated to one or more department social workers that she wanted to engage in "services" and achieve a period of sobriety. In light of the respondent's unambiguous statements, as reflected in the investigative notes, that she wanted to pursue adoption and did not want to work toward reunification, however, the respondent's reference to "services" reasonably and logically could be interpreted as an indication that the respondent wanted to engage in services of some type for her own benefit; they were not necessarily inconsistent with her stated desire to pursue adoption for Cameron and to have the ability to visit with him, yet not be a parent to him. In light of the relevant evidence with respect to these events preceding the adjudication date and the court's subordinate findings, we conclude that the court reasonably determined that the petitioner proved by clear and convincing evidence that the respondent was unable or unwilling to benefit from reunification efforts. Accordingly, we reject the respondent's claim.

## II

Next, the respondent claims that the court improperly found that the department made reasonable efforts to reunify her with her child. We need not reach the merits of this claim.

As our discussion of the court's decision reflects, in its analysis under § 17a-112 (j) (1), the court found that the respondent was unable or unwilling to benefit from reunification efforts. Alternatively, the court found that the department made reasonable reunification efforts in this case. The respondent, accurately observing that the petitioner did not allege in the petition to terminate her parental rights that reasonable efforts had been made, argues that the court improperly relied on this ground. See, e.g., *In re Christian P.*, 98 Conn. App. 264, 267–68, 907 A.2d 1261 (2006) (petitioner limited to grounds set forth in termination of parental rights petition). Further, the respondent argues that, even if the court could rely on this ground, the court's finding that reasonable efforts had been made was clearly erroneous. The petitioner acknowledges that it did not allege in the termination of parental rights petition that reasonable efforts had been made and for purposes of this appeal does not rely on this ground to support the court's judgment.

Under § 17a-112 (j) (1), the court may grant a petition to terminate parental rights after finding that the parent is unable or unwilling to benefit from reunification efforts *or* that the department has made reasonable reunification efforts. See footnote 7 of this opinion. In part I of this opinion, we rejected the respondent's challenge to the court's finding that she was unable or unwilling to benefit from reunification efforts. Accordingly, the petitioner did not need to prove that reasonable reunification efforts had been made.

The judgment is affirmed.

In this opinion the other judges concurred.

\* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79a-12, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

\*\* November 26, 2019, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] In this appeal, Cameron's attorney has adopted the brief filed by the petitioner, the Commissioner of Children and Families. See Practice Book §§ 67-13 and 79a-6 (c).

[2] The court found, and it is not in dispute, that the identity of Cameron's biological father is unknown. On February 28, 2018, the petitioner brought the coterminous petitions against Alexander R. and John Doe as putative fathers of the child. On April 27, 2018, the court, having obtained the results of DNA testing of Alexander R., issued a finding of nonpaternity and removed Alexander R. from the case. On August 28, 2018, the court granted the petitioner's motion for permission to cite in Kyle Matthew B. as a putative father of the child. On October 2, 2018, the court, having obtained the results of DNA testing of Kyle Matthew B., issued a finding of nonpaternity and removed Kyle Matthew B. from the case. Pursuant to General Statutes § 52-108, "parties misjoined may be dropped, by order of the court, at any stage of the action, as the court deems the interests of justice require." John Doe was served by publication and was later defaulted for failing to appear. Following the trial in this case, the court terminated the parental rights of John Doe as to Cameron, and no appeal has been filed on behalf of John Doe.

[3] In this appeal, the respondent does not raise a claim related to the court's findings that the petitioner proved, by clear and convincing evidence, that the ground alleged for termination of parental rights existed and that termination was in Cameron's best interests.

[4] As noted previously, an ex parte motion for temporary custody, a neglect petition and a termination of parental rights petition were filed simultaneously. Practice Book § 33a-6 (d) requires a court to issue preliminary specific steps at the time it grants an ex parte motion for temporary custody, pending the required preliminary ten day hearing to determine whether the court should vest temporary care of the child in the petitioner pending disposition of the petitions. At the preliminary hearing, if the order of temporary custody is sustained, as it was in the present case, the court again is required to issue specific steps that the petitioner and the parent shall take for the parent to regain custody of the child. General Statutes § 46b-129 (c) (6); Practice Book § 33a-7. The issuance by the court of specific steps at the time the ex parte temporary custody order is issued and at the time of the preliminary hearing on temporary custody is automatically required, and not contingent on whether a respondent indicates a willingness to reunify with the child. The issuance of such steps, therefore, should not be construed as indicative of any determination by the court that, at the time the steps are issued, the respondent is willing or able to benefit from reunification services. Nor should the failure of the court to issue specific steps at the time it signs an ex parte custody order or at the time of the preliminary ten day hearing be construed as indicative of a determination by the court that, at that time, the respondent was unable or unwilling to benefit from reunification services.

[5] "Neonatal Abstinence Syndrome" is defined as "[a] disorder of newborns exposed to addictive drugs (especially opioids) either in the womb or at birth, characterized by a complex of symptoms associated with withdrawal,

including high-pitched crying, tremor, inadequate food intake, fever, sweating, and vomiting." American Heritage Dictionary of the English Language (5th Ed. 2019).

[6] "Fetal Alcohol Syndrome" is defined as "a variable cluster of birth defects that may include facial abnormalities, growth deficiency, mental retardation, and other impairments, caused by the mother's consumption of alcohol during pregnancy." Random House Webster's Unabridged Dictionary (2d Ed. 2001), p. 711.

[7] General Statutes § 17a-112 (j) provides in relevant part: "The Superior Court, upon notice and hearing as provided in sections 45a-716 and 45a-717, may grant a petition filed pursuant to this section if it finds by clear and convincing evidence that (1) the Department of Children and Families has made reasonable efforts to locate the parent and to reunify the child with the parent in accordance with subsection (a) of section 17a-111b, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts, except that such finding is not required if the court has determined at a hearing pursuant to section 17a-111b, or determines at trial on the petition, that such efforts are not required . . . ."

[8] General Statutes § 17a-112 (k) provides: "Except in the case where termination of parental rights is based on consent, in determining whether to terminate parental rights under this section, the court shall consider and shall make written findings regarding: (1) The timeliness, nature and extent of services offered, provided and made available to the parent and the child by an agency to facilitate the reunion of the child with the parent; (2) whether the Department of Children and Families has made reasonable efforts to reunite the family pursuant to the federal Adoption and Safe Families Act of 1997, as amended from time to time; (3) the terms of any applicable court order entered into and agreed upon by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order; (4) the feelings and emotional ties of the child with respect to the child's parents, any guardian of such child's person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties; (5) the age of the child; (6) the efforts the parent has made to adjust such parent's circumstances, conduct, or conditions to make it in the best interest of the child to return such child home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions, and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child; and (7) the extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent."

[9] The court also terminated the parental rights of John Doe with respect to Cameron. See footnote 2 of this opinion. This aspect of the court's judgment is not a subject of this appeal.

[10] In addition to finding that the respondent was unable or unwilling to benefit from reunification efforts, the court found that the department made reasonable efforts to reunify the respondent and Cameron. This finding is the subject of the respondent's second claim which we address in part II of this opinion.

[11] The adjudication date is the date on which the termination of parental rights petition or the latest amendment thereto is filed. See Practice Book § 35a-7.

[12] See footnote 7 of this opinion.

[13] We observe that, on August 13, 2018, the petitioner filed a "Motion to Cite in Party and Amend Neglect Petition." In the motion, the petitioner sought permission "to amend the neglect petition and petition for termination of parental rights filed on February 28, 2018, by citing in Kyle Matthew [B.] as a putative father of the minor child." No proposed amended petitions were attached to the motion. In support of the motion, the petitioner represented that Alexander R. was proven by DNA testing not to be Cameron's biological father and that the respondent recently had advised the department that Kyle Matthew B. may be Cameron's biological father. On August 28, 2018, the court granted the motion, however, the petitioner did not thereafter file amended petitions. The record reflects that Kyle Matthew B. appeared and waived any defects in service as to the petitions. There is no

return of service as to Kyle Matthew B. in the court file.

In light of the fact that the petitioner's motion did not in any way seek to alter the substantive allegations brought against the respondent by way of the coterminous petitions filed on February 28, 2018, and, having obtained permission to amend the petitions, the petitioner did not thereafter file amended petitions in this case, we conclude that the court's ruling on August 28, 2018, did not give rise to a new adjudication date in the present case.

[14] "The clear and convincing standard of proof is substantially greater than the usual civil standard of a preponderance of the evidence, but less than the highest legal standard of proof beyond a reasonable doubt. It is sustained if the evidence induces in the mind of the trier a reasonable belief that the facts asserted are highly probably true, that the probability that they are true or exist is substantially greater than the probability that they are false or do not exist. . . .

"Although we have characterized this standard of proof as a middle tier standard . . . and as an intermediate standard . . . between the ordinary civil standard of a preponderance of the evidence, or more probably than not, and the criminal standard of proof beyond a reasonable doubt, this characterization does not mean that the clear and convincing standard is necessarily to be understood as lying equidistant between the two. Its emphasis on the high probability and the substantial greatness of the probability of the truth of the facts asserted indicates that it is a very demanding standard and should be understood as such . . . . We have stated that the clear and convincing evidence standard should operate as a weighty caution upon the minds of all judges, and it forbids relief whenever the evidence is loose, equivocal or contradictory." (Citations omitted; emphasis omitted; internal quotation marks omitted.) *In re Giovanni C.*, 120 Conn. App. 277, 279–80, 991 A.2d 638 (2010).

[15] Additionally, the respondent urges us to conclude that *In re Kyara H.*, supra, 147 Conn. App. 871, supports the conclusion that, in determining whether reasonable efforts would be futile, the court had an obligation to consider events that occurred subsequent to the adjudication date. The respondent correctly notes that, in *In re Kyara H.*, this court observed that, in the absence of a court order that otherwise relieves the department of its reasonable efforts obligation, it must continue to make reasonable efforts up to the time of the trial's conclusion. Id. This observation, however, is not inconsistent with the court's unambiguous statement that "[w]hen making its reasonable efforts determination during the adjudicatory phase . . . [the court] is limited to considering only those facts preceding the filing of the termination petition or the most recent amendment to the petition . . . ." (Internal quotation marks omitted.) Id., 870–71. Thus, the court in *In re Kyara H.* set forth and relied on the legal principle that the respondent challenges in the present case.

The respondent also relies on language in *In re Vincent B.*, 73 Conn. App. 637, 809 A.2d 1119 (2002), cert. denied, 262 Conn. 934, 815 A.2d 136 (2003), to support her argument. The respondent draws our attention to a sentence in *In re Vincent B.*, in which, unlike the present case, this court reviewed a trial court's finding that the department had made reasonable reunification efforts in a case involving a petition brought under § 17a-112 (j) (3) (E). Id., 640. This court observed that clear and convincing evidence did not demonstrate that the respondent was unable or unwilling to benefit from reasonable reunification efforts "at all times prior to the date of [the respondent's] termination hearing . . . ." Id., 646. Although the significance of the trial court's statement is not as clear as is could be, we decline to interpret the court's reference to reunification efforts leading up to the termination hearing to reflect a change in this court's well settled jurisprudence with respect to the proper scope of the court's inquiry in the adjudicative phase of a termination of parental rights trial.

[16] As we have discussed previously, there was evidence that, as early as February 23, 2018, the department and the respondent were aware that Alexander R. would not consent to the respondent's plan to pursue a private adoption. We emphasize, however, that although there was evidence that, prior to the adjudication date, the respondent was unhappy to learn that Alexander R. would not agree to Cameron's adoption, there was no evidence that, prior to the adjudication date, the respondent represented to the department that she wanted to abandon plans for adoption and pursue reunification. As we have explained, the respondent testified that she changed her mind about reunifying with Cameron only after she learned that Alexander R. was not his biological father.