******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# IN RE TIARA E.*
## (AC 48130)

Elgo, Moll and Flynn, Js.

*Syllabus*

The respondent father appealed from the judgment of the trial court for the petitioner, the Commissioner of Children and Families, terminating his parental rights as to his minor child. He claimed, inter alia, that the court, in making its determination that the Department of Children and Families had made reasonable efforts to reunify him with his child, improperly relied on information contained in a social study that had been admitted into evidence and that he claimed was tinged with possible bias. *Held*:

There was sufficient evidence in the record to support the trial court's conclusion that the department made reasonable efforts to reunify the respondent father with the child, as the father merely alleged that the social studies report was possibly biased and did not object to or challenge at trial any of the subordinate factual findings in the report, and there was no evidence that the department did not make the reasonable efforts it claimed to have made.

The trial court did not err in its determination that the respondent father was unable or unwilling to benefit from the department's proffered services, as the father failed to demonstrate that the facts alleged in the termination petition were insufficient to sustain the court's judgment.

Argued March 10—officially released April 10, 2025**

*Procedural History*

Petition by the Commissioner of Children and Families to terminate the respondents' parental rights with

---

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79a-12, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the court.

Moreover, in accordance with federal law; see 18 U.S.C. § 2265 (d) (3) (2018), as amended by the Violence Against Women Act Reauthorization Act of 2022, Pub. L. No. 117-103, § 106, 136 Stat. 49, 851; we decline to identify any person protected or sought to be protected under a protection order, protective order, or a restraining order that was issued or applied for, or others through whom that person's identity may be ascertained.

** April 10, 2025, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

respect to their minor child, brought to the Superior Court in the judicial district of New Haven, Child Protection Session, and tried to the court, *Conway, J.*; judgment terminating the respondents' parental rights, from which the respondent father appealed to this court. *Affirmed.*

*Matthew C. Eagan*, assigned counsel, for the appellant (respondent father).

*Andrew M. Ammirati*, assistant attorney general, with whom, on the brief, were *William Tong*, attorney general, and *Nisa J. Khan*, assistant attorney general, for the appellee (petitioner).

*Rachel T. Crane*, assigned counsel, for the minor child.

*Opinion*

ELGO, J. The respondent father, Anthony E., appeals from the judgment of the trial court rendered in favor of the petitioner, the Commissioner of Children and Families, terminating his parental rights with respect to his minor child, Tiara E. On appeal, the respondent claims that the court improperly (1) relied on information contained in a social study that was admitted into evidence in determining that the petitioner had furnished sufficient evidence that the Department of Children and Families (department) had made reasonable efforts to reunify him with Tiara and (2) determined that he was unable or unwilling to benefit from the services offered by the department.[1] We affirm the judgment of the court.

---

[1] The respondent's counsel has also briefed, at some length, a claim related to the allegedly unconstitutional framework of our statutory scheme, arguing that "the statutory interplay" between General Statutes §§ 17a-112 (j) and 17a-111b allows for "an impermissible end run around the clear and convincing evidentiary standard." We declined to review an identical claim advanced by the same counsel in *In re Jadiel B.*, 228 Conn. App. 290, 295–96 n.6, 324 A.3d 211, cert. denied, 350 Conn. 921, 325 A.3d 217 (2024). For reasons we have already made clear, we again decline to address that constitutional claim.

The following undisputed facts, which the court found by clear and convincing evidence, and procedural history are relevant to this appeal. Tiara was born in January, 2021.[2] The respondent was incarcerated at the time of the birth, and Tiara spent her first four weeks in the hospital due to drug withdrawal symptoms. In February, 2021, while the respondent was still incarcerated, the petitioner sought and obtained a temporary custody order for Tiara. After an initial placement with the paternal great-grandmother, Tiara was then adjudicated neglected and committed to the petitioner's care.[3] At that time, the respondent had been released from incarceration but was unhoused, unemployed, and believed to be using illicit substances.

In October, 2021, the court issued specific steps that required the respondent, inter alia, to take part in counseling, submit to random drug testing, procure adequate housing and income, and cooperate with any services provided by the department.[4] Tiara's permanency plan at that time called for reunification.

---

[2] Tiara's mother, whose parental rights were also terminated, did not appear during the termination proceedings and has not participated in this appeal.

[3] Tiara was reunified with her mother for several months in 2021, while they were both residing at an inpatient substance abuse treatment program. As the court noted, "[u]pon the mother and [Tiara's] discharge from the program, they resided with the mother's aunt until the mother left the home and failed to return after several days." The respondent's whereabouts were unknown at the time, and the petitioner sought and regained custody of Tiara in October, 2021. The child has remained committed to the petitioner's care ever since.

[4] The specific steps ordered for the respondent in October, 2021, were as follows: Keep all appointments set by the department; inform the department as to location of his residence and of any changes to his contact information; inform the department as to any changes in the makeup of his household to confirm that such change does not negatively impact the health and safety of Tiara; take part in counseling and make progress toward treatment goals, including in the areas of parenting, individual, and family as well as to make progress toward recognizing "the impact of substance abuse and mental health on parenting"; accept in-home support services provided by the department and cooperate with them; submit to substance abuse evaluation and follow any treatment recommendations; submit to random drug testing;

As the court noted in its memorandum of decision, the respondent was, in the fall of 2021, "abusing drugs and his drugs of choice included heroin, cocaine and fentanyl." During this time, the respondent was "substantively homeless, living from place to place and at times in an auto/truck repair garage." From approximately November, 2021, through March, 2022, the respondent was undergoing methadone treatment. During that time, he tested positive for benzodiazepines, cocaine, and fentanyl. Although the department provided him with a list of providers, "he ultimately never followed through with entering inpatient treatment."

The respondent began visiting with Tiara in January, 2022, after not communicating with the department for several months, and he had three subsequent visits in the months that followed. Tiara was the respondent's only child, and he reported that he had no parenting skills. The respondent also "demonstrated insight into his inability to provide a safe, stable, and sober home for Tiara." The department also reported, however, that, during the visits in early 2022, the respondent was observed to be "loving, gentle, and receptive to learning how to care for Tiara." According to the department, despite these promising signs, the respondent was "inconsistent with his visits and his communication with the department" during this time.

In September, 2022, the department met with the respondent and discussed the possibility of supervised

do not use illegal drugs or prescription drugs not legally prescribed, or abuse alcohol or medicine; get and/or maintain adequate housing and legal source of income; do not break any law and, if involved with the criminal justice system, comply with any criminal court orders and follow conditions of probation/parole; visit Tiara as often as permitted and keep her in Connecticut; provide to the department the names and contact information of any individuals who should be considered as a placement resource for Tiara; sign appropriate releases of information with service providers; and cooperate with service providers concerning recommendations for parenting/individual/family counseling, including substance abuse assessment/treatment.

parent-child visitation services. The respondent informed the social worker that "he did not want to engage in services and that he was living from place to place trying to avoid being arrested on an outstanding warrant." As to supervised parent-child visits, the respondent "told the social worker that he wanted one supervised visit to see how it went but he first wanted to discuss the issue with his great-grandfather and he would get back in touch with the department." The respondent indicated that he wanted to have one visit with Tiara the following week but that he was not willing to have ongoing, weekly visits.

The respondent was arrested again in October, 2022. While he was incarcerated, the department brought Tiara to the correctional institution, at which point the respondent consistently attended monthly supervised parent-child visits beginning in December, 2022. The respondent also completed a Tier II substance abuse program while incarcerated.

In December, 2022, Tiara was placed in relative foster care with a distant paternal cousin. She has remained there throughout all the relevant periods leading up to this appeal, and she "enjoys a strong and healthy child-parent attachment to her foster parents."

In May, 2023, the petitioner filed a motion to approve a change in the permanency plan for Tiara, from reunification to termination of parental rights. The petitioner cited the inability of the respondent or the mother to "sustain their mental health or a willingness to sustain sobriety when in the community." At that point, Tiara had been in the custody of the petitioner for two years, but neither parent had "sustained stable housing, legal nor stable employment and [had] not been consistent with visiting their child." The petitioner recommended Tiara's adoption by her current foster parents, noting that Tiara "presents to be bonded with the family and

relies on the adults in the home for her needs to be met." Although the petitioner reported that the respondent was initially unopposed to the termination of his rights, the respondent later objected to the proposed permanency plan, citing the best interests of Tiara, as well as a purported lack of reasonable efforts on the part of the department to achieve reunification.

In June, 2023, the department was made aware of allegations that the respondent had been charged with breach of the peace in the second degree for an incident in which, while still incarcerated, he threatened to "burn down" the foster mother's house, with her in it. As a result of these actions, the respondent received an additional six month sentence, which ran concurrent to his ongoing sentence.

After a hearing in August, 2023, the court approved the revised permanency plan. Subsequently, the petitioner, in October, 2023, filed a petition seeking to terminate the parental rights of both the mother and the respondent, alleging that the department had made reasonable efforts to reunify and that the respondent had failed to achieve a sufficient level of rehabilitation pursuant to General Statutes § 17a-112 (j) (3) (B). In the petition, the petitioner alleged, inter alia, that the department had made reasonable efforts at reunification, that the respondent was unable or unwilling to benefit from reunification efforts, and that reasonable efforts were no longer necessary because the trial court already had approved a plan other than reunification.

On his release from incarceration in May, 2024, the respondent was referred by the department to fatherhood engagement services (FES), a program that connects fathers with services including parent education and assistance in obtaining employment. He attended only a few sessions and was unsuccessfully discharged from that program. The respondent was also referred

to substance abuse assessment and relapse prevention treatment but failed to follow through with those services.

The trial for the termination of parental rights was held over two days in the summer of 2024. The petitioner called three social workers: Rodney Moore (Moore), Luigina Allen, and Angel Moore (Angel). The petitioner also submitted into evidence the specific steps issued to both the mother and the respondent, a social study submitted in support of the termination of parental rights and a supplement thereto, two department status reports from December, 2023, and May, 2024, two studies in support of the motions to review the permanency plan from May, 2023, and April, 2024, the October 12, 2021 affidavit of Lauren Papagoda, a social worker employed by the department, the social study that was filed in support of the neglect petition, and certified copies of the respondent's and the mother's criminal histories. The respondent called Stephen Humphrey, a clinical psychologist, as a witness and submitted his written report into evidence. The respondent also testified on his own behalf.

Moore testified that he was assigned to work the case in March, 2021. At the time that the case was transferred to him, Moore testified that there were ongoing issues with the respondent's homelessness, substance abuse, and parenting ability. On cross-examination, Moore testified that Papagoda, who had also been assigned to Tiara's case, had "identified herself as a possible resource for Tiara once [the department was not] able to establish a permanent placement for [Tiara]."[5] Moore subsequently testified, under questioning from the petitioner's counsel, that Papagoda had been removed from the case due to her interest in adopting Tiara. Moore

_____

[5] The testimony at trial was that Tiara was not placed with Papagoda.

further testified that Papagoda had disclosed her interest in adopting Tiara in September, 2022, and that the case was transferred to another office in October that same year. When asked if there were any concerns about Papagoda's bias in handling the case due to her interest in adopting Tiara, Moore responded, simply, "No."

Allen testified that she was assigned to the case in July, 2022. Allen further testified that, in October, 2022, the respondent was incarcerated on a warrant for failure to appear at a court hearing. She also testified that the respondent had informed her that, as of the time of the termination trial, he did not have adequate housing for Tiara.

Angel testified that she was assigned to the case in October, 2022. She further testified that the respondent had become upset on hearing Tiara identify the foster father as "dad" and subsequently threatened to burn down Tiara's foster home.

Humphrey testified that he had evaluated the interaction and bonding between the respondent and Tiara in his office. Humphrey's report detailed the one hour session in his office, noting that the respondent presented as "skilled with regard to various positive parenting skills, including active listening, following Tiara's lead, asking interesting and age appropriate questions, setting limits, and maintaining a warm and nurturing demeanor." Humphrey's report concluded that the respondent "exhibited healthy attachment promoting behaviors, and Tiara appeared comfortable and pleased in her interactions with her father. Continued interaction is likely to strengthen the parent-child bond. The bond between the two is currently strong and healthy."

The respondent testified that he had not used drugs for the previous two years and that he had gone "cold

turkey" rather than attend a methadone treatment program, which he left on his own accord. The respondent further testified that he attended a parenting class, "a few times," which had been recommended by the department, but that "all the guys just sat there and talked about their problems, and I just really didn't see any parenting skills being taught." The respondent also testified that, since he was released from prison, his visits with Tiara had increased to once a week for two hours. As for employment, the respondent testified that he worked for his grandfather, but the job was "not on the books." The court inquired as to what steps he had taken to work on reunification efforts, and the respondent replied that he was looking for employment, having recently submitted two applications, but that his status as a convicted felon was interfering with his ability to secure employment. The court also inquired as to whether the respondent had been prescribed psychiatric medication, to which the respondent testified that, while he had been incarcerated, he had been prescribed psychiatric medication but that, when he was moved to a different facility, another psychiatrist took him off the medication. The respondent then testified that, "I remember talking to the psychiatrist and the psychiatrist saying oh, you don't have psychiatric problems . . . you're a drug addict."

In its memorandum of decision, the court found, by clear and convincing evidence, that the department had made reasonable efforts to reunify the respondent with Tiara.[6] Pointing to the department's efforts since the

---

[6] "A hearing on a petition to terminate parental rights consists of two phases, adjudication and disposition. . . . If the trial court determines that a statutory ground for termination exists, it proceeds to the dispositional phase. In the dispositional phase, the trial court determines whether termination is in the best interest of the child." (Internal quotation marks omitted.) *In re Timothy B.*, 219 Conn. App. 823, 835, 296 A.3d 342, cert. denied, 349 Conn. 919, 318 A.3d 439 (2023).

inception of the case, the court found that the department had "diligently attempted to locate and/or maintain contact and communication with the respondent." The court also found that the respondent was unwilling or unable to benefit from reunification efforts and had remained so since the adjudication date in October, 2023. The court noted that, since his release from prison in May, 2024, "housing continues to be an issue" and that the respondent "concedes his housing situation is not suitable for a child." The court also noted the respondent's failure to engage with substance abuse evaluation, as well as his unwillingness to complete the FES sessions and his inability to secure gainful employment. The court explained that, although the respondent asked for more time to rehabilitate, he had offered "no definitive timeline or articulated plan to achieve stable, appropriate housing or gainful employment."

The court also quoted at length from the December, 2023 status report admitted into evidence, which states in relevant part: "[The respondent] was seen by the psychiatrist. Medications were stopped. He does not have an [a]xis 1 diagnosis. He has an extreme substance abuse disorder. He makes light of this. He often refuses groups. His engagement with [mental health] services is minimal . . . . Sobriety is the key to his doing well when he leaves in the spring." The status report further noted that the nurse "reports that when asked about the connection between his substance abuse and criminal involvement, [the respondent] presented [as] amused as he slightly laughed." The court concluded that, especially in light of the recent events including his threats against the foster mother, the respondent's "prior and severe abuse of substances, his years of cycling in and out of the criminal justice system . . . and his behavioral challenges and decision making during his most

recent period of incarceration, an assessment/evaluation of [the respondent's] need, if any, for ongoing substance abuse treatment was and remains warranted." The court noted that the respondent believes that he does not need any treatment, but that this belief "is not consistent with the credible evidence and testimony put forth at trial. Affording [the respondent] additional time will not change his intransigence. . . . [The respondent] is adrift in the community and without reliable and effective support people and systems. [The respondent's] level of rehabilitation falls far short of what is required for this court to conclude that he will be able to assume a responsible position in Tiara's life within a reasonable period of time. Accordingly, the petitioner has proven [the respondent's] failure to rehabilitate."

The court further found, by clear and convincing evidence, that termination of the respondent's parental rights was in Tiara's best interest,[7] and emphasized that Tiara "needs and deserves caregivers who are stable, sober, and capable of maintaining a safe and nurturing home environment for her." The court thus terminated the parental rights of both the respondent and the mother, and this appeal followed.[8]

I

On appeal, the respondent argues that there was insufficient evidence to support the court's determination that the department made reasonable efforts at reunifying Tiara with the respondent. More specifically, the respondent claims that the court improperly relied on information contained in the social study—despite

---

[7] The respondent does not challenge the propriety of the court's best interest determination in this appeal.

[8] Pursuant to Practice Book §§ 67-13 and 79a-6 (c), the attorney for the minor child filed a statement adopting the brief of the petitioner and supporting the affirmance of the judgment terminating the respondent's parental rights.

the fact that the social study was admitted into evidence without objection.[9] According to the respondent, the trial court should not have relied on information in that report simply because the department's social worker, Papagoda, had developed an interest in becoming a permanent resource for Tiara.[10] Papagoda's role in the case, the respondent contends, "tinged" the social study with "possible bias" such that the court could not, as a matter of law, make the appropriate finding by clear and convincing evidence.

In response, the petitioner emphasizes the undisputed facts that the respondent, through his trial counsel, did not subpoena Papagoda's testimony, did not object at trial to the admissibility of the social study, and did not argue to the court that it should consider Papagoda's alleged "bias" when weighing the factual findings contained in the social study. The petitioner thus contends that the respondent is unable to demonstrate any actual bias that should erode our confidence in the court's determination that the department made reasonable efforts to reunify Tiara with the respondent.

[9] Social studies routinely are relied on by our trial courts in termination proceedings. See, e.g., *In re Jadiel B.*, 228 Conn. App. 290, 301–303, 324 A.3d 211 (trial court relied on social study admitted into evidence in concluding that respondent was unable or unwilling to benefit from department's reunification efforts), cert. denied, 350 Conn. 921, 325 A.3d 217 (2024); *In re Prince S.*, 219 Conn. App. 629, 642, 296 A.3d 296 ("[b]ecause that social study was admitted as a full exhibit at trial without objection, the court was entitled to rely on it in making its findings"), cert. denied, 347 Conn. 907, 297 A.3d 1011 (2023); *In re Gabriel C.*, 196 Conn. App. 333, 357, 229 A.3d 1073 (noting that "the court was obligated by statute to consider the social studies before judgment on the [termination] petitions could be rendered"), cert. denied, 335 Conn. 938, 248 A.3d 708 (2020).

[10] The respondent concedes that Papagoda was removed from the case after informing her supervisors of her interest in becoming a permanent resource for Tiara. At oral argument before this court, the respondent also conceded that all the pertinent records created during Papagoda's participation in the case, including documenting those services that were offered to the respondent, had been made available to counsel and that counsel did not challenge any of these records.

Significantly, the respondent concedes that he is "not able to demonstrate actual bias in social worker Papagoda's reporting" and confines his claim "to whether the document, tinged with possible bias, could rise to the level of clear and convincing evidence."[11] In essence, the respondent asks us to conclude, as a matter of law, that a social study that is admitted into evidence without objection at trial should nonetheless be found deficient on appeal if a party can demonstrate that there is "possible bias" in the report. In response, the petitioner urges us to decline the respondent's novel request and conclude that the court had ample evidence that the department made reasonable efforts to reunify the respondent with Tiara. We agree with the petitioner.

The following legal principles and standard of review are relevant to our resolution of this claim. "Section 17a-112 (j) (1) requires that before terminating parental rights, the court must find by clear and convincing evidence that the department has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts provided such finding is not required if the court has determined at a hearing . . . that such efforts are not appropriate . . . . Thus, the department may meet its burden concerning reunification in one of three ways: (1) by showing that it made such efforts, (2) by showing that the parent was unable or unwilling to benefit from reunification efforts or (3) by

---

[11] We note that the only document before the trial court that is attributed to Papagoda, namely, her October 13, 2021 affidavit, is focused almost exclusively on the mother, noting with regard to the respondent only that the department had tried to contact him during the mother's brief reunification with Tiara in 2021, and that his whereabouts were "unknown." Papagoda was not listed as a possible permanent resource in the department's May, 2023 study in support of changing the permanency plan for Tiara from reunification to termination of parental rights and adoption. Her role in the case, by all accounts, ended in 2022.

a previous judicial determination that such efforts were not appropriate. . . . [I]n determining whether the department has made reasonable efforts to reunify a parent and a child . . . the court is required in the adjudicatory phase to make its assessment on the basis of events preceding the date on which the termination petition was filed. . . . This court has consistently held that the court, [w]hen making its reasonable efforts determination . . . is limited to considering only those facts preceding the filing of the termination petition or the most recent amendment to the petition . . . ." (Citation omitted; internal quotation marks omitted.) *In re Ryder M.*, 211 Conn. App. 793, 808–809, 274 A.3d 218, cert. denied, 343 Conn. 931, 276 A.3d 433 (2022). "The word reasonable is the linchpin on which the department's efforts in a particular set of circumstances are to be adjudged, using the clear and convincing standard of proof. Neither the word reasonable nor the word efforts is, however, defined by our legislature or by the federal act from which the requirement was drawn. . . . [R]easonable efforts means doing everything reasonable, not everything possible." (Internal quotation marks omitted.) *In re Jah'za G.*, 141 Conn. App. 15, 31, 60 A.3d 392, cert. denied, 308 Conn. 926, 64 A.3d 329 (2013).

Our review of the court's reasonable efforts determination is subject to the evidentiary sufficiency standard of review. See *In re Ryder M.*, supra, 211 Conn. App. 809. The appropriate question, then, is "whether the trial court could have reasonably concluded, upon the facts established and the reasonable inferences drawn therefrom, that the cumulative effect of the evidence was sufficient to justify its [ultimate conclusion]. . . . When applying this standard, we construe the evidence in a manner most favorable to sustaining the judgment of the trial court. . . . We will not disturb the court's

subordinate factual findings unless they are clearly erroneous. . . . A factual finding is clearly erroneous when it is not supported by any evidence in the record or when there is evidence to support it, but the reviewing court is left with the definite and firm conviction that a mistake has been made." (Internal quotation marks omitted.) *In re Phoenix A.*, 202 Conn. App. 827, 842, 246 A.3d 1096, cert. denied, 336 Conn. 932, 248 A.3d 1 (2021).

At oral argument, the respondent's counsel conceded that, at the termination trial, the respondent did not object to or challenge any of the subordinate factual findings contained in the department's social study in support of the petition to terminate his parental rights. The respondent's counsel further conceded that there was no attempt at trial to challenge the representations contained in the social study as to what services the department provided to the respondent and that there is no evidence that the department *did not* make the reasonable efforts that were claimed to have been made.[12] The respondent has also not challenged any of the factual findings that supported the petition to terminate his parental rights that related to his status *after* Papagoda's involvement with the case but prior to the adjudicatory date—such facts including his incarcerated status, his long history of substance abuse, and his lack of employment or adequate housing.

The respondent, nonetheless, argues that "[t]he trial court's reliance on the social study, which relied on the earlier reports of social worker Papagoda, caused it to make a decision based on evidence that is insufficient to meet the clear and convincing standard of proof

---

[12] At trial, the respondent did not argue that Papagoda biased the proceedings in any way or even that the department had not made sufficient efforts to reunify him with Tiara.

applicable in this case. Any conclusions as to the department's efforts or the respondent's willingness to participate prior to October, 2022, are tinged by the potential bias of the department's social worker."[13]

We do not reverse trial court rulings based on potentials—and the respondent's argument lacks any demonstration that there was actual bias that impacted the composition of the social study or the ultimate findings of the court. The respondent points to four specific representations that were made in the social study that allegedly are "tinged" by Papagoda's "potential for bias": (1) that the respondent reported to the department that he has "no parenting skills" but that he planned to learn from his great-grandmother until she died in September, 2021; (2) that the respondent accepted the department's offer for supervised visitation in January, 2022, after not seeing Tiara or communicating with the department for several months; (3) that, despite several positive visits with Tiara, the respondent was "inconsistent with his visits and his communication" with the department; and (4) that the respondent reported that he was not willing to have ongoing weekly visits with Tiara. These simply are, though, facts that are unfavorable to the respondent. The respondent provides no analysis of these events that demonstrates bias, nor does he point to anything in the record that contradicts the validity of these facts. The only mention of bias at trial was during the cross-examination of Moore, who, when asked whether there were any concerns about bias influencing the findings of the social study, simply stated, "No." We reiterate that, until this appeal, the respondent has not asserted that this testimony should not have been credited by the court. In the absence of an objection, the court was free to credit

---

[13] We note that the social study, filed one year after Papagoda was removed from the case, was submitted, reviewed, and approved by three different department employees—none of whom was Papagoda.

the findings of the report "without limitation." *In re Kasmaesha C.*, 148 Conn. App. 666, 678, 84 A.3d 1279, cert. denied, 311 Conn. 937, 88 A.3d 549 (2014).[14]

In light of the foregoing, we reject the respondent's claim that the "possible bias" in the social study precluded the court from determining that the department made reasonable reunification efforts, as required by § 17a-112 (j) (1). We therefore conclude that the evidence adduced at trial was sufficient to support the court's determination that the department made reasonable efforts at reunifying the respondent with Tiara.

## II

The respondent also argues that "the same reasons" that support his argument that the department did not engage in reasonable efforts apply to his claim that the court erred in determining that the respondent was unable or unwilling to benefit from proffered services. The respondent argues that the record does not support

---

[14] We also note that Papagoda had been removed from the case by October, 2022—one full year before the adjudicatory date—October 17, 2023—in this case. From that point, through the adjudicatory date of the petition, the respondent was incarcerated. As the court noted in its memorandum of decision, while he was incarcerated the respondent successfully completed a Tier II substance abuse treatment program and the department brought Tiara to the facility for supervised visits with the respondent. The respondent also testified that he went "cold turkey" while incarcerated, but he never submitted to a substance abuse evaluation—what the court called a "reasonable and prudent" request predicated on the respondent's specific steps. At oral argument before this court, the respondent's counsel conceded that the ability of the department to provide services to incarcerated individuals is limited. As we have repeatedly iterated, the mere fact that an individual is incarcerated is an insufficient ground to terminate that individual's parental rights. At the same time, "the reality is that incarceration imposes limitations on what the department and its social workers can do and what services it can provide for an incarcerated parent facing termination of his or her parental rights. . . . The reasonableness of the department's efforts must be viewed in the context of these limitations." (Citation omitted; internal quotation marks omitted.) *In re Karter F.*, 207 Conn. App. 1, 15–16, 262 A.3d 195, cert. denied, 339 Conn. 912, 261 A.3d 745 (2021).

the court's finding by clear and convincing evidence that he was unable or unwilling to benefit from services as of the adjudication date because, "immediately after incarceration, the respondent . . . engaged in as many substantive services as possible, including substance abuse treatment, mental health treatment, and monthly visitation with his child." The petitioner contends that the court had ample evidentiary support for the conclusion that the respondent was unable or unwilling to benefit from services offered by the department. We agree with the petitioner.

"[I]n determining whether the department has made reasonable efforts to reunify a parent and a child or whether there is sufficient evidence that a parent is unable or unwilling to benefit from reunification efforts, the court is required in the adjudicatory phase to make its assessment on the basis of events preceding the date on which the termination petition was filed. See also Practice Book § 35a-7 (a)." (Internal quotation marks omitted.) *In re Kyara H.*, 147 Conn. App. 855, 870, 83 A.3d 1264, cert. denied, 311 Conn. 923, 86 A.3d 468 (2014). We review the court's "subordinate factual findings for clear error and then we review the trial court's ultimate determination that a respondent parent was unwilling or unable to benefit from reunification services for evidentiary sufficiency . . . ." (Internal quotation marks omitted.) *In re Cameron W.*, 194 Conn. App. 633, 662–63, 221 A.3d 885 (2019), cert. denied, 334 Conn. 918, 222 A.3d 103 (2020). Put differently, we ask "whether the trial court could have reasonably concluded, upon the facts established and the reasonable inferences drawn therefrom, that the cumulative effect of the evidence was sufficient to justify its [ultimate conclusion]. . . . When applying this standard, we construe the evidence in the light most favorable to sustaining the judgment of the trial court. . . . [An

appellate court does] not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached. . . . [Rather] every reasonable presumption is made in favor of the trial court's ruling." (Internal quotation marks omitted.) Id., 667–68.

The court concluded that, as of the adjudicatory date of October 17, 2023, the respondent was unable or unwilling to benefit from reunification and that he remained so in August, 2024.[15] As of the adjudicatory date, the respondent was incarcerated, having been arrested in October, 2022. As discussed in part I of this opinion, the respondent merely alleges, in conclusory fashion, that certain facts alleged in the petition were, by virtue of Papagoda's participation in the events leading up to the filing of the petition to terminate the respondent's parental rights, "tinged" with "possible bias." We cannot help but conclude that the court had ample evidence before it by which to find that, as of October, 2023, the respondent was unwilling or unable to benefit from services offered by the department, including the social study in support of the petition to terminate parental rights and the May, 2023 study in support of the motion to review the permanency plan. The May, 2023 study noted that the respondent had been inconsistent or noncompliant with his specific steps, failing to communicate with the department on a regular basis and failing to engage in outpatient substance abuse treatment. As we noted previously in this opinion, the respondent has not challenged the factual findings of the court, instead taking a strategy at trial to beg the court for more time in order to rehabilitate.

---

[15] We note that, in February, 2024, the petitioner provided the court with an addendum to the termination of parental rights petition. That addendum reported that the respondent had been engaging in monthly in-person visits with Tiara, and that, despite early challenges, Tiara was willing to play with the respondent and, although she did not "appear bonded," she was nonetheless "familiar" with the respondent.

As a matter of law, conclusory allegations such as these, especially when raised for the first time on appeal, simply cannot serve as a sufficient basis to overturn the court's finding that the respondent was unable or unwilling to benefit from the services provided by the department—services that he does not dispute were offered to him.

We must consider the evidence in the light most favorable to sustaining the judgment of the court. In the absence of any demonstration that the facts alleged in the petition to terminate the respondent's parental rights were insufficient to sustain the judgment of the court, we simply cannot determine that the court's ruling was erroneous.

The judgment is affirmed.

In this opinion the other judges concurred.